**Slip Op. 10-73**

# UNITED STATES COURT OF INTERNATIONAL TRADE

---

FORMER EMPLOYEES OF INVISTA, S.A.R.L.,   :

                             *Plaintiffs*,       :

                v.                       :            Court No. 07-00160

U.S. SECRETARY OF LABOR,          :

                         *Defendant*.       :

---

[Granting Plaintiffs' application for attorneys' fees and expenses under the Equal Access to Justice Act]

Dated:  June 28, 2010

Ruskin Moscou Faltischek, P.C. (Thomas A. Telesca), for Plaintiffs.

Tony West, Assistant Attorney General; Jeanne E. Davidson, Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice.

## OPINION

RIDGWAY, Judge:

In this action, former employees of the Chattanooga, Tennessee plant operated by Invista, S.a.r.l. ("the Workers") contested the determinations of the U.S. Department of Labor denying their petition for certification of eligibility for trade adjustment assistance ("TAA") and alternative trade adjustment assistance ("ATAA").  The determinations at issue included the Labor Department's original denial of the Workers' petition, as well as the agency's denial of the Workers' request for reconsideration, and the agency's negative determination following a voluntary remand. *See* 72 Fed.

Reg. 7907, 7909 (Feb. 21, 2007) (notice of denial of petition); 72 Fed. Reg. 15,169 (March 30, 2007)

(notice of denial of request for reconsideration); 73 Fed. Reg. 32,739 (June 10, 2008) (notice of

negative determination on voluntary remand, or "Remand Determination").

Invista I reviewed the Workers' challenge to the Labor Department's negative Remand

Determination (*i.e.*, the negative determination in the voluntary remand proceeding), and remanded

this matter to the agency for a second time. *See* Former Employees of Invista, S.a.r.l. v. U.S. Sec'y

of Labor, 33 CIT ____, 626 F. Supp. 2d 1301 (2009) ("Invista I"). As a result of the investigation

in the course of the second remand, the Labor Department granted the Workers' Petition, amending

the agency's 2004 TAA/ATAA certification of Invista workers to cover the Workers at issue here.

*See* Notice of Revised Determination on Remand, 74 Fed. Reg. 51,195 (Oct. 5, 2009) ("Second

Remand Determination"); Supplemental Administrative Record ("Second Supplemental

Administrative Record"). That determination was sustained in Invista II. *See* Former Employees

of Invista, S.a.r.l. v. U.S. Sec'y of Labor, 33 CIT ____, 657 F. Supp. 2d 1359 (2009) ("Invista II").[1]

---

[1]The administrative record in this action consists of three parts – the initial Administrative
Record, which the Labor Department filed after this action was commenced; the Supplemental
Administrative Record, which was filed after the agency's negative determination on remand; and
a second Supplemental Administrative Record (the "Second Supplemental Administrative Record"),
which was filed with the Second Remand Determination.

Expressing concern that much of the information in the administrative record that had been
designated "confidential" by the Labor Department in fact was not confidential, Invista II instructed
the Labor Department to review and resubmit the entire administrative record, including specific
justification (with citations to appropriate legal authority, and supported by the requisite factual
showings) for each proposed redaction. *See* Invista II, 33 CIT at ____ n.1, 657 F. Supp. 2d at 1360-
61 n.1. The Government has now made that submission. *See* Defendant's Filing Pursuant to the
Court's October 9, 2009 Order. Although the merits of some of the Government's arguments
concerning confidentiality are questionable, the resubmitted administrative record itself complies
with the instructions in Invista II. In addition, the Government advises that it is working to identify
"ways that [the Labor Department's] Trade Adjustment Assistance ('TAA') procedures for obtaining

Now pending before the Court is Plaintiffs' Application for Fees and Other Expenses Pursuant to the Equal Access to Justice Act, seeking an award in the sum of $13,463.20,[2] which the Government opposes. *See* Plaintiffs' Memorandum of Law in Support of Equal Access to Justice Act Application ("Pls.' EAJA Application"); Defendant's Response to Plaintiffs' Application for Attorney Fees and Expenses ("Def.'s Response").

For the reasons set forth below, Plaintiffs' Application for Fees and Other Expenses must be granted.

## I. **Background**

As Invista II noted, "[t]his should have been a relatively easy case for the Labor Department. The agency previously certified former Invista employees who did *the same jobs* at *the same plant* as the Workers at issue here." *See* Invista II, 33 CIT at _____, 657 F. Supp. 2d at 1361 (*citing* Invista I, 33 CIT at _____, 626 F. Supp. 2d at 1305). The only significant issue which the Labor Department had to resolve in this case was whether the termination of these Workers was "attributable to the basis for [the 2004 TAA/ATAA] certification" – that is, whether the termination of these Workers

and filing confidential information in Court proceedings may be improved in the future." *Id*. at 2.

Even as resubmitted, however, all three parts of the record include confidential business information. Therefore, both public and confidential versions of all three parts of the record have been filed with the court. References herein to the public version of the initial Administrative Record (as resubmitted) are noted as "A.R. _____"; references to the public version of the Supplemental Administrative Record (as resubmitted) are noted as "S.A.R. _____"; and references to the public version of the Second Supplemental Administrative Record (as resubmitted) are noted as "S.S.A.R. _____." There are no cites to the confidential record herein.

[2]As discussed in section II.B below, this figure does not include a cost of living adjustment.

was "attributable to" the 2004 shift of production to Mexico.[3]  *See*, *e.g.*, Weirton Steel Corporation, Weirton, WV: Negative Determination on Remand, 73 Fed. Reg. 52,066, 52,068 (Sept. 8, 2008) ("Weirton Steel") (articulating standard for amendment of TAA/ATAA certification to extend period of coverage to include worker separations occurring after expiration date of original TAA/ATAA certification).[4]  The Labor Department nevertheless required "four bites at the apple" to conduct the thorough investigation mandated by statute, delaying for more than two and a half years the Workers' certification for the TAA/ATAA benefits to which the Labor Department ultimately determined they are entitled.  *See* Invista II, 33 CIT at ____, ____, 657 F. Supp. 2d at 1361, 1364-65 (citations omitted).

As detailed in Invista I and Invista II, the plaintiff Workers in this case are former employees of the Nylon Apparel Filament Fibers Group at Invista's Chattanooga, Tennessee plant.  At the time of their termination on January 31, 2007, they processed orders for apparel fiber in support of apparel fiber production at an Invista plant in Mexico.  Apparel fiber had previously been manufactured at the Chattanooga plant, until domestic production ceased and all such production

---

[3]In its Response, the Government repeatedly states that the issue before the Labor Department was whether "plaintiff's jobs . . . were . . . shifted to Mexico."  *See* Def.'s Response at 15; *see also id*. at 12 (same); *id*. at 13 (same).  However, the Government simply has it wrong.  As discussed in greater detail below, no one ever contended that the *plaintiff Workers' jobs* had shifted to Mexico.  Instead, the issue in this case was whether the termination of these Workers in early 2007 was "attributable to" the 2004 shift of production to Mexico, so as to warrant the amendment of the agency's 2004 TAA/ATAA certification to cover the Workers here.

[4]For further explanation of the Labor Department's practice of amending TAA/ATAA certifications, *see generally* United Steel, Paper and Forestry, Rubber, Mfg., Energy, Allied Indus. and Service Workers v. U.S. Sec'y of Labor, 33 CIT ____, ____, 2009 WL 1175654 at * 3-8 (2009) ("Steelworkers II"); *see also* Invista I, 33 CIT at ____ & n.5, 626 F. Supp. 2d at 1309 & n.5 (citing various cases involving requests to amend certifications to extend certification period).

was shifted to a facility in Mexico in 2004. Since the 2004 shift of production, only nylon performance filament fiber ("performance fiber") has been produced at the Chattanooga plant. *See generally* Invista I, 33 CIT at ____, 626 F. Supp. 2d at 1305; Invista II, 33 CIT at ____, 657 F. Supp. 2d at 1361.

The 2004 shift of production to Mexico led to widespread layoffs of production workers and support personnel at the Chattanooga plant. At that time, Invista management filed a petition for TAA and ATAA benefits on behalf of the terminated workers, which the Labor Department granted. Specifically, the Labor Department's 2004 certification certified as eligible for TAA and ATAA all Invista workers "engaged in *employment related to the production of*," *inter alia*, apparel fiber "who became totally or partially separated from employment on or after June 7, 2003, through two years from the date of certification [*i.e.*, two years from August 20, 2004]." *See generally* Invista I, 33 CIT at ____, 626 F. Supp. 2d at 1305-06 (*quoting* 69 Fed. Reg. 54,320, 54,321 (Sept. 8, 2004)) (emphasis added); Invista II, 33 CIT at ____, 657 F. Supp. 2d at 1361.

The Workers at issue here survived the 2004 layoffs, and continued their work at the Chattanooga site in support of apparel fiber production, even after that production shifted to Mexico. However, on November 14, 2006 – a mere three months after the Labor Department's 2004 TAA/ATAA certification expired – the Workers were notified that they were being terminated effective January 31, 2007. *See generally* Invista I, 33 CIT at ____, 626 F. Supp. 2d at 1306; Invista II, 33 CIT at ____, 657 F. Supp. 2d at 1361.

Shortly thereafter, Invista's Chattanooga Plant Manager filed the TAA/ATAA petition at issue here, on behalf of the Workers. In the TAA/ATAA Petition, Invista's Plant Manager attested, under oath, that the Workers' terminations were "a continuation of the shift in production to Mexico

as described in [the 2004 TAA/ATAA certification] that expired August 20, 2006." *See* A.R. 2; Invista I, 33 CIT at ____, 626 F. Supp. 2d at 1306; Invista II, 33 CIT at ____, 657 F. Supp. 2d at 1362. The Plant Manager further explained that – notwithstanding the 2004 shift of production to Mexico – "all orders [for apparel fiber had] continued to be processed from the United States" up to the time of the filing of the 2006 TAA/ATAA Petition, but that, for the future, all such work was being transferred to "CSR's [*i.e.*, Customer Service Representatives] located in South America." *See* A.R. 2; Invista I, 33 CIT at ____, 626 F. Supp. 2d at 1306 (citation omitted); Invista II, 33 CIT at ____, 657 F. Supp. 2d at 1362. The TAA/ATAA Petition also noted that several of the subject Workers were age 50 or older, that their skills were "not easily transferable," and that "[c]ompetitive conditions within the industry are adverse." *See* A.R. 2; Invista I, 33 CIT at ____, 626 F. Supp. 2d at 1306; Invista II, 33 CIT at ____, 657 F. Supp. 2d at 1362.

The Labor Department denied the Workers' TAA/ATAA Petition. *See generally* Invista I, 33 CIT at ____, 626 F. Supp. 2d at 1306 (*citing* 72 Fed. Reg. at 7909 (denying TAA/ATAA Petition on grounds that "[t]he workers' firm does not produce an article as required for certification")); Invista II, 33 CIT at ____, 657 F. Supp. 2d at 1362. The Labor Department found that "domestic production of an article within . . . [Invista's] Nylon Apparel Filament Fibers Group [had] ceased more than one year [before]" the Workers' termination, and that the petitioning Workers thus "were not in support of domestic production *within the requisite one year period*" – an allusion to 29 C.F.R. § 90.2, which concerns cases involving allegations of "increased imports" (not "shift of production" cases such as the case at bar). *See* A.R. 31 (emphasis added); 29 C.F.R. § 90.2 (2006)[5];

_____

[5]All citations to regulations are to the 2006 edition of the Code of Federal Regulations.

Invista I, 33 CIT at ____, 626 F. Supp. 2d at 1306; Invista II, 33 CIT at ____, 657 F. Supp. 2d at 1362. The Labor Department therefore concluded that the Workers could not be "considered import impacted or affected by a shift in production of an article"; and, because the agency determined that the Workers were not eligible for TAA, the Workers' petition for ATAA was also denied. *See* A.R. 31-32; Invista I, 33 CIT at ____, 626 F. Supp. 2d at 1306; Invista II, 33 CIT at ____, 657 F. Supp. 2d at 1362. At no time in the course of its initial investigation did the Labor Department consider amending the 2004 TAA/ATAA certification to extend the period of coverage to include the Workers at issue here.

The Workers requested that the Labor Department reconsider its denial of their TAA/ATAA Petition, underscoring that they had "missed the opportunity of receiving . . . [TAA and ATAA] benefits by less than 3 months," and emphasizing that they would have been covered by the 2004 TAA/ATAA certification – and thus would have been eligible for TAA/ATAA benefits – if only Invista management had notified the Workers of their impending terminations "in August, versus November of 2006." *See* A.R. 35-38; Invista I, 33 CIT at ____, 626 F. Supp. 2d at 1306-07; Invista II, 33 CIT at ____, 657 F. Supp. 2d at 1362. Significantly, echoing a point made by Invista's Chattanooga Plant Manager in the TAA/ATAA Petition, the Workers' Request for Reconsideration stated that their layoffs were, in effect, the culmination of the 2004 shift of production of apparel fiber to Mexico – the "direct result of the . . . apparel machines going to Mexico, the loss of textile manufacturing in the U.S. the bigger picture." *See* A.R. 36; Invista I, 33 CIT at ____, 626 F. Supp. 2d at 1307 (citations omitted); Invista II, 33 CIT at ____, 657 F. Supp. 2d at 1362.

Notwithstanding the statements in the Workers' Request for Reconsideration linking their termination to Invista's 2004 shift of production, the Labor Department again gave no consideration

to amending the 2004 TAA/ATAA certification to extend the period of coverage to include the Workers here. Instead, the Labor Department denied the Workers' Request for Reconsideration, with no further investigation whatsoever. *See* 72 Fed. Reg. at 15,169. The Labor Department acknowledged the Workers' claim that their termination was "a direct result of the same shift in production to Mexico . . . which resulted in workers certification for TAA in 2004." *See* A.R. 45; Invista I, 33 CIT at ____, 626 F. Supp. 2d at 1307 (citations omitted); Invista II, 33 CIT at ____, 657 F. Supp. 2d at 1362-63. However, the Labor Department stated that, pursuant to agency regulations, it only "considers production that occurred one year prior to the date of the petition" – once again alluding to 29 C.F.R. § 90.2 (even though, on its face, the referenced provision of the regulation is limited to cases involving "increased imports," and has nothing to do with "shift of production" cases like this). *See* A.R. 46; 29 C.F.R. § 90.2; Invista I, 33 CIT at ____, 626 F. Supp. 2d at 1307 (citation omitted); Invista II, 33 CIT at ____, 657 F. Supp. 2d at 1363. The Labor Department concluded that, because the Chattanooga plant had ceased production of apparel fiber in 2004, the Workers' TAA/ATAA Petition was "outside of the relevant period." *See* A.R. 46; Invista I, 33 CIT at ____, 626 F. Supp. 2d at 1307 (citation omitted); Invista II, 33 CIT at ____, 657 F. Supp. 2d at 1363.

This action followed. The Workers sought judgment on the agency record, arguing, *inter alia*, that the Labor Department had denied the Workers' TAA/ATAA Petition based on the agency's determination that the Workers "were not in support of domestic production within the requisite one year period," but that the agency had failed to identify the authority for any such asserted one-year limitation. *See* Invista I, 33 CIT at ____, 626 F. Supp. 2d at 1307 (citations omitted); Invista II, 33 CIT at ____, 657 F. Supp. 2d at 1363. In addition, the Workers faulted the

Labor Department for "fail[ing] to adequately consider the relevancy of the prior [TAA/ATAA] certification." *See* Invista I, 33 CIT at _____, 626 F. Supp. 2d at 1307 (citation omitted); Invista II, 33 CIT at _____, 657 F. Supp. 2d at 1363.

Conceding that, by its express terms, the one-year limitation set forth in 29 C.F.R. § 90.2 applies only in cases where layoffs result from "increased imports," the Government sought – and was granted – a voluntary remand to permit the Labor Department to consider in the first instance the relevance of 29 C.F.R. § 90.2's "one-year rule" in "shift of production" cases such as this. *See* 29 C.F.R. § 90.2 (defining "increased imports" by reference to a "representative base period" which is "one year consisting of the four quarters immediately preceding the date which is twelve months prior to the date of the petition"); Invista I, 33 CIT at _____, 626 F. Supp. 2d at 1307 (citations omitted); Invista II, 33 CIT at _____, 657 F. Supp. 2d at 1363.

In its Negative Determination on Remand (the determination at issue in Invista I), the Labor Department abandoned its reliance on the one-year time limitation in 29 C.F.R. § 90.2. Instead, the Labor Department denied the Workers' TAA/ATAA claims based on the agency's determination that the Workers' terminations "[were] not related to the shift of production of apparel nylon filament to Mexico in 2004," but, rather, were the result of "a business decision to improve the efficiency of . . . [Invista's] customer service organization." *See* 73 Fed. Reg. at 32,739; Invista I, 33 CIT at _____, 626 F. Supp. 2d at 1307; Invista II, 33 CIT at _____, 657 F. Supp. 2d at 1363.[6]

---

[6]In light of its conclusion that "the shift of production to a foreign country was not a cause of the workers' separations," the Labor Department reserved judgment as to "the impact of the fact that no production took place at the subject firm during the twelve month period prior to the filing of the petition." *See* 73 Fed. Reg. at 32,740; Invista I, 33 CIT at _____, 626 F. Supp. 2d at 1307-08; Invista II, 33 CIT at _____, 657 F. Supp. 2d at 1363.

The principal evidence supporting the Labor Department's finding was the conclusory statement of an Invista lawyer, who attributed the Workers' termination not to "the decision made in 2004 to stop production of Nylon Apparel at the Chattanooga Site," but rather to "a business decision to improve the efficiency of the customer service organization." *See* S.A.R. 18; *see also* Invista I, 33 CIT at ____, 626 F. Supp. 2d at 1309-10. Although the statement of the Invista lawyer was in direct conflict with other evidence already on the record – including, most notably, the sworn statement of Invista's Chattanooga Plant Manager – the Labor Department made no attempt to reconcile the inconsistency. *Compare*, *e.g.*, A.R. 2 (Invista Plant Manager's sworn statement attesting that the Workers' terminations were "a continuation of the [2004] shift in production to Mexico") *with* S.A.R. 18 (unsworn statement of Invista lawyer, asserting that Workers' separations were not attributable to 2004 shift of production). Nor did the Labor Department articulate any rationale for its decision to credit the statement on which it relied and to disregard the other, conflicting record evidence. Because the Labor Department determined that the Workers were not eligible for TAA, their petition for ATAA was denied as well. *See* 73 Fed. Reg. at 32,740; Invista I, 33 CIT at ____, 626 F. Supp. 2d at 1308; Invista II, 33 CIT at ____, 657 F. Supp. 2d at 1363.

The Workers' renewed challenge to the Labor Department's denial of their TAA/ATAA Petition was the subject of Invista I. Invista I addressed in detail the Labor Department's affirmative obligation to investigate TAA/ATAA claims "with the utmost regard for the interests of the petitioning workers." *See generally* Invista I, 33 CIT at ____, ____, 626 F. Supp. 2d at 1304-05, 1308 (*citing* Local 167, Int'l Molders and Allied Workers' Union, AFL-CIO v. Marshall, 643 F.2d 26, 31 (1ˢᵗ Cir. 1981); Former Employees of BMC Software, Inc. v. U.S. Sec'y of Labor, 30 CIT

1315, 1321, 454 F. Supp. 2d 1306, 1312 (2006) ("BMC I") (collecting additional cases)).[7]  Invista

I explained that, in a case such as this, where there is a potentially relevant prior TAA/ATAA

certification, the Labor Department must consider the possibility of doing what it has done in other,

similar cases – that is, the Labor Department must consider amending the prior certification to

extend coverage to the new group of petitioning workers.  *See* Invista I, 33 CIT at ____, 626 F.

Supp. 2d at 1309; *see also* Invista II, 33 CIT at ____, 657 F. Supp. 2d at 1364.

Invista I observed that the administrative record in this case was replete with evidence

supporting the Workers' claim that their terminations were "attributable to the basis for [the original,

*i.e.*, the 2004] certification" – that is, the 2004 shift of apparel fiber production to Mexico; and,

moreover, that the evidence to the contrary (including, in particular, the statement of the Invista

lawyer) was "not only scant, but also weak."  *See* Invista II, 33 CIT at ____, 657 F. Supp. 2d at

1364; Invista I, 33 CIT at ____, 626 F. Supp. 2d at 1309-10 (*quoting* Weirton Steel, 73 Fed. Reg.

at 52,068).  As Invista I noted, the Labor Department's own standards required the Workers'

certification if there was a "causal nexus" between the 2004 shift of production and their

terminations, notwithstanding the fact that the terminations occurred more than two years after the

original 2004 TAA/ATAA certification (and thus after the original 2004 TAA/ATAA certification

---

[7]*See also*, *e.g.*, Former Employees of Warp Processing Co. v. U.S. Dep't of Labor, 33 CIT ____, ____, 2009 WL 424491 at * 2 (2009) (underscoring agency obligation to conduct TAA investigations with "the utmost regard" for interests of petitioning workers); Former Employees of Welex, Inc. v. U.S. Sec'y of Labor, 32 CIT ____, ____, ____, ____, 2008 WL 7020688 at * 2, 9, 13 (2008) (same); Former Employees of Elec. Mobility Corp. v. U.S. Sec'y of Labor, 32 CIT ____, ____, 2008 WL 7020689 at * 5 (2008) (same); Former Employees of Fairchild Semi-Conductor Corp. v. U.S. Sec'y of Labor, 32 ____, ____, 2008 WL 1765519 at * 3 (2008) (same); Chen v. Chao, 32 CIT ____, ____, 587 F. Supp. 2d 1292, 1298 (2008) (same); Former Employees of Joy Techs., Inc. v. U.S. Sec'y of Labor, 31 CIT 1835, 1842, 523 F. Supp. 2d 1369, 1377 (2007) (same).

had expired). *See id.*, 33 CIT at \_\_\_\_, 626 F. Supp. 2d at 1311 (*quoting* Weirton Steel, 73 Fed. Reg. at 52,068); *see also id.*, 33 CIT at \_\_\_\_, 626 F. Supp. 2d at 1309.

Invista I therefore remanded this matter to the Labor Department for a second time, with instructions requiring the agency to "thoroughly and independently investigate the facts of the case, and – based on that investigation – . . . [to] consider all legal theories under which the petitioning Workers might be eligible for certification, including the possible amendment of the 2004 TAA/ATAA certification." *See* Invista I, 33 CIT at \_\_\_\_, 626 F. Supp. 2d at 1311; *see also* Invista II, 33 CIT at \_\_\_\_, 657 F. Supp. 2d at 1364.

Remarkably, in the second remand proceeding, it took just *a single phone call* between the Labor Department and a senior representative of Invista to confirm what Invista's Chattanooga Plant Manager and the Workers themselves had been telling the agency for more than two and a half years – that is, that the Workers' termination was a direct (albeit delayed) result of Invista's 2004 shift of apparel fiber production to Mexico (which, in turn, was the basis for the Labor Department's 2004 TAA/ATAA certification of the Workers' former Invista colleagues). *See* Invista II, 33 CIT at \_\_\_\_, 657 F. Supp. 2d at 1364 (*citing* S.S.A.R. 45, 69-71 (documenting Aug. 21, 2009 phone call)). As a result of that phone conversation, the Labor Department reversed its three prior denials and granted the Workers' TAA/ATAA Petition, extending the agency's 2004 certification of eligibility to apply for both TAA and ATAA to cover the Workers here. *See* 74 Fed. Reg. 51,195-96; Invista II, 33 CIT at \_\_\_\_, 657 F. Supp. 2d at 1364-65.

## II. **Analysis**

Under the Equal Access to Justice Act ("EAJA"):

> [A] court shall award to a prevailing party other than the United States fees and other expenses . . . incurred by that party in any civil action . . . , including proceedings for judicial review of agency action, brought by or against the United States . . . , unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust.

28 U.S.C. § 2412(d)(1)(A) (2000).[8]  Thus, although the court retains a measure of discretion as to the size of the award, under the EAJA "a trial court *must* award attorney's fees where: (i) the claimant is a 'prevailing party'; (ii) the government's position was not substantially justified; (iii) no 'special circumstances make an award unjust'; and (iv) the fee application is timely submitted and supported by an itemized statement." Libas, Ltd. v. United States, 314 F.3d 1362, 1365 (Fed. Cir. 2003) (citations omitted) (emphasis added) (also noting "the imperative language" of EAJA statute); *accord* Hubbard v. United States, 480 F.3d 1327, 1331 (Fed. Cir. 2007) (acknowledging "mandatory" nature of EAJA award); Brickwood Contractors, Inc. v. United States, 288 F.3d 1371, 1379 (Fed. Cir. 2002) (same).[9]

The Government here does not dispute that the Workers were "prevailing parties." Nor does

---

[8]Except as otherwise indicated, all statutory citations are to the 2000 edition of the United States Code.

[9]The Government effectively *reverses* the applicable standard, asserting that "[t]he EAJA allows an award of attorney fees and other expenses to a prevailing party *only if the Court determines that the position taken by the Government was not substantially justified . . . .*" *See* Def.'s Response at 8 (emphasis added).  However, to prevail here, the Workers are not required to prove that the Government's position *was not* "substantially justified."  Rather, the Government must prove that its position *was* "substantially justified." *See*, *e.g.*, Libas, 314 F.3d at 1365 (citations omitted).  If the Government fails to carry that burden, the trial court "*must* award attorney's fees . . . ." Libas, 314 F.3d at 1365 (citations omitted) (emphasis added).

the Government argue either that there are "special circumstances" that would render an award unjust,[10] or that the Workers' application for fees and expenses was untimely or excessive. The Government's opposition to the Workers' request for an award of fees and expenses thus rests entirely on its contention that the United States' position was "substantially justified," both at the agency level and in litigation. *See generally* Def.'s Response at 1 (explaining that Government "challenge[s] neither plaintiffs' prevailing party status, nor the reasonableness of the amount of fees they seek," and bases its opposition to an award of fees and expenses solely on its position that "the Government's position in this matter was substantially justified").

As discussed in greater detail below, the United States' position at the administrative level, at a minimum, was not "substantially justified." The Workers are therefore entitled to an award of attorneys' fees and expenses under the EAJA.

### A. **Whether the Government's Position Was "Substantially Justified"**

The Government bears the burden of proving that its position was "substantially justified." *See*, *e.g.*, Libas, 314 F.3d at 1365 (citations omitted); Doty v. United States, 71 F.3d 384, 385 (Fed. Cir. 1995) (citations omitted). To be "substantially justified," the Government's position must be

---

[10]The EAJA's "special circumstances" exception to an award of fees and expenses serves as a "'safety valve' [which] helps to insure that the Government is not deterred from advancing in good faith the novel but credible extensions and interpretations of the law that often underlie vigorous enforcement efforts. It also gives the court discretion to deny awards where equitable considerations dictate an award should not be made." Devine v. U.S. Customs Service, 733 F.2d 892, 895-96 (Fed. Cir. 1984) (*quoting* H.R. Rep. No. 1418, 96th Cong., 2d Sess. 11, *reprinted in* 1980 U.S.C.C.A.N. 4984, 4990). *See*, *e.g.*, Taylor v. United States, 815 F.2d 249, 252 (3d Cir. 1987) (explaining that "special circumstances" provision permits consideration of traditional equitable principles in determining whether fee award is warranted); Oguachuba v. Immigration & Naturalization Service, 706 F.2d 93, 98 (2d Cir. 1983) (same).

"justified in substance or in the main – that is, justified to a degree that could satisfy a reasonable person." Pierce v. Underwood, 487 U.S. 552, 565 (1988). That a party other than the Government prevailed in an action does not establish that the Government's position was not substantially justified. Luciano Pisoni Fabbrica Accessori Instrumenti Musicali v. United States, 837 F.2d 465, 467 (Fed. Cir. 1988).

In determining whether substantial justification exists, a court is to weigh not only "the position taken by the United States in the civil action, [but also] the action or failure to act by the agency upon which the civil action is based," taking into consideration the "totality of the circumstances." 28 U.S.C. § 2412(d)(2)(D); Kelly v. Nicholson, 463 F.3d 1349, 1355 (Fed. Cir. 2006); Doty, 71 F.3d at 385-86 (citations omitted); Chiu v. United States, 948 F.2d 711, 715 (Fed. Cir. 1991) ("trial courts are instructed to look at the entirety of the government's conduct and make a judgment call" as to "the government's overall position"); Essex Electro Eng'rs, Inc. v. United States, 757 F.2d 247, 253 (Fed. Cir. 1985) (articulating "totality of the circumstances" standard).

Reaching a determination on substantial justification requires that a court reexamine the legal and factual circumstances of a case through the EAJA "prism" – "a different perspective than that used at any other stage of the proceeding." Luciano Pisoni, 837 F.2d at 467; Libas, 314 F.3d at 1366 (*quoting* United States v. Hallmark Constr. Co., 200 F.3d 1076, 1080 (7th Cir. 2000)). Nevertheless, "the court's merits reasoning may be quite relevant to the resolution of the substantial justification question." F.J. Vollmer Co., Inc. v. Magaw, 102 F.3d 591, 595 (D.C. Cir. 1996). And strong language criticizing the Government's position in an opinion discussing the merits of a key issue is evidence in support of an award of fees. *See* Marcus v. Shalala, 17 F.3d 1033, 1038 (7th Cir. 1994) (*cited in* Golembiewski v. Barnhart, 382 F.3d 721, 724 (7th Cir. 2004)). "[A] string of losses can be

indicative" as well.  Pierce v. Underwood, 487 U.S. at 569.

Moreover, in evaluating the existence of substantial justification, a trial court is entitled to take into consideration "insights not conveyed by the record, into such matters as whether particular evidence was worthy of being relied upon, or whether critical facts could easily have been verified by the Government."  Pierce v. Underwood, 487 U.S. at 560; *see also* Hensley v. Eckerhart, 461 U.S. 424, 437 (1983) (noting propriety of deference to trial court's "superior understanding of the litigation") (*quoted in* Comm'r, Immigration & Naturalization Service v. Jean, 496 U.S. 154, 161 (1990)); Libas, 314 F.3d at 1366 n.1 (in determining substantial justification, trial court may consider "not only the actual record," but also "for example, any insights which [it] may have gleaned from settlement conferences or other pretrial activities that are not conveyed by the actual record") (*citing* Pierce v. Underwood, 487 U.S. at 560).[11]

### 1.  The Role of the Labor Department in TAA Cases

The "substantial justification" analysis in this action cannot be conducted in a vacuum.  The justification for the Government's position instead must be analyzed in the context of the trade adjustment assistance ("TAA") statute, and the special duties and obligations that the Labor

---

[11]*Accord* Praseuth v. Rubbermaid, Inc., 406 F.3d 1245, 1256, 1257 (10th Cir. 2005) (noting that trial court enjoys "the benefit of a degree of familiarity with trial court proceedings [the appellate court] cannot hope to match," and that trial court has an "inherent advantage in passing on a fee request given its familiarity with the proceedings below"); Interfaith Community Organization v. Honeywell Int'l, 426 F.3d 694, 718 (3d Cir. 2005) (deferring to trial court's "far greater understanding of the deadlines it imposed and the complexity of the underlying litigation"); Lyden v. Howerton, 731 F. Supp. 1545, 1553 (S.D. Fla. 1990) (noting, in analysis of "substantial justification," that "[o]ftentimes, as here, the published record of the case does not reveal the full aura and nuances of the litigation.  Although the court finds that the public record justifies finding the government without substantial justification in both law and fact, the history, procedure, and the historical context, specifically within this court's knowledge, buttresses this conclusion.").

Department owes to workers in its administration of that statute. *See generally* <u>BMC I</u>, 30 CIT at

1315-22, 454 F. Supp. 2d at 1307-13 (summarizing policy underpinnings, legislative history, and

practical implications of TAA).

The TAA laws are remedial legislation,[12] designed to assist workers who have lost their jobs

as a result of increased import competition from – or shifts in production to – other countries, by

helping those workers "learn the new skills necessary to find productive employment in a changing

American economy." <u>Former Employees of Chevron Prods. Co. v. U.S. Sec'y of Labor</u>, 26 CIT

1272, 1273, 245 F. Supp. 2d 1312, 1317 (2002) (*quoting* S. Rep. No. 100-71, at 11 (1987)).

The TAA program entitles eligible workers to receive benefits which may include

employment services (such as career counseling, resume-writing and interview skills workshops,

and job referral programs), vocational training, job search and relocation allowances, income support

payments (known as "Trade Readjustment Allowance" or "TRA" payments), and a Health Insurance

Coverage Tax Credit. *See generally* 19 U.S.C. § 2272 *et seq.* (2000 & Supp. II 2002). In addition,

one of the newer features is the wage insurance benefit for older workers, known as Alternative

---

[12]*See*, *e.g.*, <u>Former Employees of Sonoco Prods. Co. v. Chao</u>, 372 F.3d 1291, 1301 (Fed. Cir. 2004) (Mayer, C.J., dissenting) (emphasizing "remedial" nature of TAA statute); <u>UAW v. Marshall</u>, 584 F.2d 390, 396 (D.C. Cir. 1978) (noting "general remedial purpose" of TAA statute, and that "remedial statutes are to be liberally construed" to effectuate their intended purpose); <u>Fortin v. Marshall</u>, 608 F.2d 525, 526, 529 (1st Cir. 1979) (same); <u>Usery v. Whitin Machine Works, Inc.</u>, 554 F.2d 498, 500, 502 (1st Cir. 1977) (highlighting "remedial" purpose of TAA statute); <u>BMC I</u>, 30 CIT at 1320-21 & n.9, 454 F. Supp. 2d at 1311 & n.9 (collecting additional cases) (explaining that TAA laws are "remedial legislation" to be "construed broadly to effectuate their intended purpose"); *see also* <u>Fairchild Semi-Conductor Corp.</u>, 32 CIT at ____, 2008 WL 1765519 at * 3 (same); <u>Chen v. Chao</u>, 32 CIT at ____, 587 F. Supp. 2d at 1301 (noting "remedial purpose" of TAA statute); <u>Welex</u>, 32 CIT at ____, 2008 WL 7020688 at * 2 (stating that TAA laws are "remedial legislation and, as such, are to be construed broadly"); <u>Former Employees of Merrill Corp. v. United States</u>, 31 CIT 415, 426, 483 F. Supp. 2d 1256, 1266 (2007) (explaining that "courts liberally construe the TAA provisions of the Trade Act to effectuate legislative intent").

Trade Adjustment Assistance ("ATAA"). ATAA allows eligible workers age 50 or older, for whom retraining may not be appropriate, to accept reemployment at a lower wage and receive a wage subsidy. *See*, *e.g.*, Invista I, 33 CIT at _____ n.2, 626 F. Supp. 2d at 1304 n.2; BMC I, 30 CIT at 1318 n.5, 454 F. Supp. 2d at 1309 n.5.[13]

TAA benefits historically have been viewed as the *quid pro quo* for U.S. national policies of free trade. *See generally* BMC I, 30 CIT at 1316, 454 F. Supp. 2d at 1307-08 (and authorities cited there). As UAW v. Marshall explains, "much as the doctrine of eminent domain requires compensation when private property is taken for public use," the trade adjustment assistance laws similarly reflect the country's recognition "that fairness demand[s] some mechanism whereby the national public, which realizes an overall gain through trade readjustments, can compensate the particular . . . workers who suffer a [job] loss." UAW v. Marshall, 584 F.2d 390, 395 (D.C. Cir. 1978). Absent TAA programs that are adequately funded and conscientiously administered,[14] "the

---

[13]*See generally* Former Employees of Independent Steel Castings Co. v. U.S. Dep't of Labor, 31 CIT 1172 (2007) (and authorities cited there) (discussing policy underpinnings of, and eligibility criteria for, ATAA; noting, *inter alia*, that ATAA wage subsidy "is clearly designed to encourage older workers who might have difficulty finding reemployment that utilizes their existing skill-sets to quickly reenter the labor market by accepting lesser-paying jobs").

[14]BMC I quoted a *Wall Street Journal* article which emphasized the importance of conscientious implementation of the TAA program:

> Calling attention to workers hurt by trade is uncomfortable for free traders. They prefer to focus on benefits of low-cost imports and high-paying export jobs. But the only way to persuade the public and politicians not to erect barriers to globalization and trade is to equip young workers to compete and protect older workers who are harmed. Creating programs with a few votes in Congress, and then *botching the execution*, doesn't help.

David Wessel, "Aid to Workers Hurt by Trade Comes in Trickle," *Wall Street Journal*, Aug. 11, 2005, at A2 (emphasis added) (*quoted in* BMC I, 30 CIT at 1370 n.84, 454 F. Supp. 2d at 1355

costs of a federal policy [of free trade] that confer[s] benefits on the nation as a whole would be imposed on a minority of American workers" who lose their jobs due to increased imports and shifts of production abroad.  *Id*.[15]

> The TAA laws also have been compared to veterans' benefits statutes:
>
> The purpose of the [TAA statute] is to distribute benefits to American workers whose jobs have been shipped overseas, while the purpose of the [veterans' benefits laws] . . . is to distribute benefits to veterans who have been injured during service.  Both are remedial acts designed to provide much needed aid.

Former Employees of Sonoco Prods. Co. v. Chao, 372 F.3d 1291, 1301 (Fed. Cir. 2004) (Mayer, C.J., dissenting).

The analogy is an apt one.  "[M]uch as Congress has charged the U.S. Department of Veterans Affairs . . . ('VA') with caring for those who have risked life and limb for our freedom, so too Congress has entrusted to the Labor Department the responsibility for providing training and other re-employment assistance to those who have paid for our place in the global economy with their jobs."  BMC I, 30 CIT at 1370, 454 F. Supp. 2d at 1355 (footnote omitted); *compare*, *e.g.*, 38 U.S.C. § 5103A (captioned  "Duty to assist claimants," obligating VA to "make reasonable efforts to assist a claimant in obtaining evidence necessary to substantiate the claimant's claim" for

---

n.84).

[15]Indeed, in introducing TAA in 1962, President Kennedy justified the program in moral terms:

> Those injured by [trade] competition should not be required to bear the full brunt of the impact.  Rather, the burden of economic adjustment should be borne in part by the federal government . . . [T]here is an obligation to render assistance to those who suffer as a result of national trade policy.

BMC I, 30 CIT at 1318, 454 F. Supp. 2d at 1309 (citation omitted).

veterans' benefits)[16] *with* 29 C.F.R. § 90.12 (Labor Department is obligated to "marshal all relevant

facts" in making its TAA determinations).[17]

---

[16]*See generally* Karnas v. Derwinski, 1 Vet. App. 308, 313 (1991) ("duty-to-assist" and "benefit-of-the-doubt" doctrines embodied in VA law "spring from a general desire to protect and do justice to the veteran who has, often at great personal cost, served our country"), *overruled on other grounds*, Kuzma v. Principi, 341 F.3d 1327, 1328-29 (Fed. Cir. 2003).

*See also* Littke v. Derwinski, 1 Vet. App. 90, 91-92 (1991) (characterizing "VA's duty to assist the veteran in developing the facts pertinent to his or her claim" as the "cornerstone of the veterans' claims process," and emphasizing that "[t]he 'duty to assist' is neither optional nor discretionary"); Godwin v. Derwinski, 1 Vet. App. 419, 425 (1991) (once veteran presents plausible claim, burden shifts to VA to assist veteran in developing "*all* relevant facts, not just those for or against the claim"); Murincsak v. Derwinski, 2 Vet. App. 363, 370 (1992) (same); 38 C.F.R. § 3.103(a) (VA Statement of Policy, which acknowledges: "Proceedings before VA are *ex parte* in nature, and it is the obligation of VA to assist a claimant in developing the facts pertinent to the claim and to render a decision which grants every benefit that can be supported in law while protecting the interests of the Government.").

> As Littke correctly observes:
>
> By assisting the claimant in developing pertinent facts, from whatever source, . . . the VA will more adequately fulfill its statutory and regulatory duty to assist the veteran. A well developed record will ensure that a fair, equitable and procedurally correct decision on the veteran's claim for benefits can be made.

Littke, 1 Vet. App. at 92. The same can be said of the Labor Department in TAA cases.

[17]*See also*, *e.g.*, Woodrum v. Donovan, 4 CIT 46, 55, 544 F. Supp. 202, 208-09 (1982) ("the [TAA statute] requires the Secretary of Labor to conduct an investigation of each properly filed petition"); Former Employees of IBM Corp., Global Services Division v. U.S. Sec'y of Labor, 29 CIT 951, 955, 387 F. Supp. 2d 1346, 1351 (2005) (rejecting Labor Department's argument that because the workers did not allege certain facts, agency was not obligated to make further inquiry, and holding that – to the contrary – "*it is incumbent upon Labor to take the lead* in pursuing the relevant facts") (emphasis added); Former Employees of Hawkins Oil & Gas, Inc. v. U.S. Sec'y of Labor, 17 CIT 126, 129, 814 F. Supp. 1111, 1114 (1993) (Labor Department "has an *affirmative duty* to investigate" whether petitioning workers are eligible for TAA benefits) (citations omitted) (emphasis added); Former Employees of Sun Apparel of Texas v. U.S. Sec'y of Labor, 28 CIT 1389, 1399 (2004) ("Labor is under a *mandatory duty* to 'conduct an investigation into each properly filed petition'") (citation omitted) (emphasis added); Former Employees of Ameriphone, Inc. v. United States, 27 CIT 1161, 1167, 288 F. Supp. 2d 1353, 1359 (2003) (Labor Department "has an

And just as veterans' benefits programs are designed to be extraordinarily "veteran-friendly" and "pro-claimant,"[18] so too Congress designed TAA as a *remedial* program, recognizing that petitioning workers would be (by definition) traumatized by the loss of their livelihood; that some might not be highly-educated; that virtually all would be *pro se*; that none would have any mastery of the complex statutory and regulatory scheme; and that the agency's process would be largely *ex parte*. Congress certainly did not intend the TAA petition process to be adversarial. Nor did Congress intend to cast the Labor Department as a "defender of the fund,"[19] sitting passively in judgment, ruling "thumbs up" or "thumbs down" on whatever evidence the *pro se* petitioning workers might manage to present. *Cf.* Former Employees of IBM Corp., Global Services Division v. U.S. Sec'y of Labor, 29 CIT 951, 956, 387 F. Supp. 2d 1346, 1351 (2005) (emphasizing that petitioning workers cannot reasonably be expected to have knowledge of the "sometimes esoteric

_____

*affirmative obligation* to conduct its own independent 'factual inquiry into the nature of the work performed by the petitioners'"); Chevron, 26 CIT at 1284-85, 245 F. Supp. 2d at 1327-28 (same).

[18]*See* Hodge v. West, 155 F.3d 1356, 1362-63 (Fed. Cir. 1998) (emphasizing that the courts "have long recognized that the character of the veterans' benefit statutes is strongly and uniquely pro-claimant"; noting that "Congress itself has recognized and preserved the unique character and structure of the veterans' benefits system," and highlighting legislative history reflecting Congressional intent to maintain "historically non-adversarial system of awarding benefits to veterans"); Kelly v. Nicholson, 463 F.3d at 1353 (referring to veterans' benefits system as "uniquely pro-claimant").

[19]*Compare* 38 C.F.R. § 3.103(a) ("it is the obligation of VA . . . to render a decision *which grants every benefit that can be supported in law while protecting the interests of the Government*") (emphasis added); Barrett v. Nicholson, 466 F.3d 1038, 1044 (Fed. Cir. 2006) (emphasizing that "[t]he government's interest in veterans cases is not that it shall win, but rather that justice shall be done, that all veterans so entitled receive the benefits due to them") (citation omitted).

criteria" for TAA certification).[20]

Quite to the contrary, the Labor Department is charged with an *affirmative* obligation to *proactively* and thoroughly investigate all TAA claims filed with the agency – and, in the words of the agency's own regulations, to "marshal all relevant facts" before making its determinations. *See* 29 C.F.R. § 90.12.[21]  Moreover, both "[b]ecause of the *ex parte* nature of the certification process, and the remedial purpose of the [TAA] program," the agency is obligated to "conduct [its]

---

[20]*See also* Lady Kelly, Inc. v. U.S. Sec'y of Agriculture, 30 CIT 186, 190, 427 F. Supp. 2d 1171, 1175 (2006) (noting that, in authorizing TAA programs, "Congress has erected an administrative regime to disburse benefits to a class of sympathetic plaintiffs with relatively little sophistication in matters of federal litigation"); Lady Kelly, Inc. v. U.S. Sec'y of Agriculture, 30 CIT 82, 84, 414 F. Supp. 2d 1298, 1300 (2006) (observing "the lack of legal sophistication of many TAA plaintiffs").

*Compare* Akles v. Derwinski, 1 Vet. App. 118, 121 (1991) (rejecting as absurd and inconsistent with agency's "duty to assist" the VA's argument that a claimant should be obligated to "specify with precision the statutory provisions or the corresponding regulations under which he is seeking benefits"; contrary to agency's contention, *claimants should not be required "to develop expertise in laws and regulations on veterans benefits* before receiving any compensation")  (emphasis added).

[21]Indeed, 29 C.F.R. § 90.12 is captioned "Investigation."  *See also* 19 U.S.C. § 2271(a) (requiring Labor Department to give notice of initiation of agency "investigation"); Woodrum v. Donovan, 4 CIT at 55, 544 F. Supp. at 208-09 (noting that "the [TAA statute] requires the Secretary of Labor to conduct an investigation of each properly filed petition").  The definition of "investigation" – a "detailed examination" or "a searching inquiry," "an official probe" – further underscores the nature of the research and analysis which the Labor Department is required to undertake. *See*, *e.g.*, BMC I, 30 CIT at 1334-35 n.29, 454 F. Supp. 2d at 1324 n.29 (*quoting* Webster's Third New International Dictionary (Unabridged) 1189 (2002)); *accord*, Welex, 32 CIT at ____ & n.15, 2008 WL 7020688 at * 9 & n.15 (same).  As BMC I pointed out:

> The bottom line . . . is that Congress has mandated that the Labor Department "investigate" workers' TAA claims – *not* that those claims be, for example, merely "considered," or "evaluated," or "reviewed."

BMC I, 30 CIT at 1334-35 n.29, 454 F. Supp. 2d at 1324 n.29.

investigation with *the utmost regard* for the interest of the petitioning workers." Local 167, Int'l Molders and Allied Workers' Union, AFL-CIO v. Marshall, 643 F.2d at 31 (emphasis added); *see also* Stidham v. U.S. Dep't of Labor, 11 CIT 548, 551, 669 F. Supp. 432, 435 (1987) (*citing* Abbott v. Donovan, 7 CIT 323, 327-28, 588 F. Supp. 1438, 1442 (1984) (quotations omitted)); Former Employees of Int'l Business Machines Corp. v. U.S. Sec'y of Labor, 29 CIT 1360, 1362, 403 F. Supp. 2d 1311, 1314 (2005) ("IBM I") (*quoting* Stidham); Former Employees of Computer Sciences Corp. v. U.S. Sec'y of Labor, 29 CIT 426, 433, 366 F. Supp. 2d 1365, 1371 (2005).

Thus, while the Labor Department is vested with considerable discretion in the conduct of its investigation of trade adjustment assistance claims, that discretion is by no means without bounds. Instead, "there exists a threshold requirement of reasonable inquiry." Former Employees of Hawkins Oil & Gas, Inc. v. U.S. Sec'y of Labor, 17 CIT 126, 130, 814 F. Supp. 1111, 1115 (1993); *see also*, *e.g.*, Former Employees of Electronic Data Sys. Corp. v. U.S. Sec'y of Labor, 29 CIT 1334, 1339, 408 F. Supp. 2d 1338, 1342-43 (2005); Former Employees of Merrill Corp. v. United States, 31 CIT 415, 423, 483 F. Supp. 2d 1256, 1264 (2007); Former Employees of Joy Techs., Inc. v. U.S. Sec'y of Labor, 31 CIT 1835, 1841, 523 F. Supp. 2d 1369, 1376 (2007); Former Employees of Welex, Inc. v. U.S. Sec'y of Labor, 32 CIT ____, ____, 2008 WL 7020688 at * 2 (2008); Former Employees of Fairchild Semi-Conductor Corp. v. U.S. Sec'y of Labor, 32 CIT ____, ____, ____, 2008 WL 1765519 at * 3, 5 (2008).

Of course, the statute does not entitle every petitioning worker to be certified as eligible to apply for TAA/ATAA benefits.[22] However, every worker *is* entitled to a *thorough* agency

---

[22]*See generally* United Glass & Ceramic Workers v. Marshall, 584 F.2d 398, 400 (D.C. Cir. 1978) (quoting legislative history explaining that job losses are not covered by TAA if they "would

investigation of his or her claim – an investigation in which the Labor Department "marshal[s] all relevant facts," and an investigation which the agency conducts with "the utmost regard" for the petitioning workers' interests. *See*, *e.g.*, Former Employees of Ameriphone, Inc. v. United States, 27 CIT 1611, 1618, 288 F. Supp. 2d 1353, 1359-60 (2003); 29 C.F.R. § 90.12.[23]  The courts therefore have not hesitated to set aside agency determinations that were the product of perfunctory investigations. *See generally* BMC I, 30 CIT at 1321-22 & n.10, 454 F. Supp. 2d at 1312-13 & n.10 (cataloguing sampling of opinions criticizing Labor Department's handling of TAA cases); *see also* Welex, 32 CIT at _____,  2008 WL 7020688 at * 2;  Joy Techs., 31 CIT at 1842, 523 F. Supp. 2d at 1376.

## 2.  The Government's Position at the Administrative Level

The Government maintains that the Labor Department's position at the administrative level was substantially justified because it "was reasonably based upon evidence in the administrative record as it existed at the time, as well as controlling precedent" from the Court of Appeals. Def.'s Response at 6-7.  According to the Government, an award of fees and expenses is not warranted because – the Government asserts – the Labor Department  "examined the evidence before it, applied what it considered to be the appropriate legal standard, and provided an analysis based upon

have occurred regardless of the level of imports, *e.g.*, those resulting from domestic competition, seasonal, cyclical, or technological factors").

[23]*Cf*. UAW v. Marshall, 584 F.2d at 397-98 (remanding case to Labor Department, emphasizing that "[e]ven if a more detailed inquiry does not change the result in this case, the class of those seeking or considering adjustment assistance will be afforded (1) a description of the circumstances that the [agency] believes mandate the choice of the plant as the appropriate subdivision and (2) an explanation why [the agency] holds that opinion.").

the facts and law as it understood them." *See* Def.'s Response at 7. However, the Government fails to address a number of salient points.

### a. The Agency's Failure to Consider Amending the 2004 TAA/ATAA Certification

As a threshold matter, the Labor Department repeatedly failed even to consider – much less investigate – the theory under which the Workers here were ultimately certified. In other words, although Invista's Plant Manager and the Workers themselves emphasized from the outset that the terminations at issue were attributable to the 2004 shift of production to Mexico, and although the agency had a practice of amending TAA/ATAA certifications in circumstances comparable to the situation here, the Labor Department nevertheless repeatedly failed to consider the possibility of amending the 2004 TAA/ATAA certification to extend coverage to the Workers in this case – first in the agency's initial investigation, then again in the agency's consideration of the Workers' Request for Reconsideration, and once more in the course of the first remand (*i.e.*, the voluntary remand). *See*, *e.g.*, A.R. 2 (Plant Manager's sworn statement attesting that the Workers' terminations were "a continuation of the [2004] shift in production to Mexico"); Invista I, 33 CIT at ____ & n.5, 626 F. Supp. 2d at 1309 & n.5 (citing sampling of cases where TAA/ATAA certifications were amended in comparable situations).[24]

_____

[24]*See also* Steelworkers II, 33 CIT at ____, 2009 WL 1175654 at * 4-8 (discussing agency's history and practice of, and criteria for, amending TAA/ATAA certifications); 29 C.F.R. § 90.17(f) (stating that, "[u]pon reaching a determination that the certification of eligibility should be continued, the certifying officer shall promptly publish in the Federal Register a summary of the determination with the reasons therefor"); United Steel, Paper and Forestry, Rubber, Mfg., Energy, Allied Indus. and Service Workers v. U.S. Sec'y of Labor, 32 CIT ____, ____, 2008 WL 1899990 at * 8 (2008) ("Steelworkers I") (noting filing of list of "eleven cases in which Labor [had] amended the expiration date of worker certifications," and surveying range of facts in those cases).

Only after the agency was specifically instructed to do so did the Labor Department finally consider amending the prior TAA/ATAA certification – and it was on that basis that the agency ultimately certified the Workers. *See* Invista I, 33 CIT at \_\_\_\_, 626 F. Supp. 2d at 1311 (remanding matter to agency with instructions to, *inter alia*, "consider all legal theories under which the petitioning Workers might be eligible for certification, including the possible amendment of the 2004 TAA/ATAA certification"); 74 Fed. Reg. 51,195 (Second Remand Determination, certifying Workers for TAA/ATAA). Nowhere has either the Labor Department or the Government sought to explain why the agency failed for so long to consider amending the 2004 TAA/ATAA certification until expressly ordered to do so by the court.

### b. The Agency's Reliance on the One-Year Limitation in 29 C.F.R. § 90.2

The Labor Department and the Government are similarly silent on the Labor Department's repeated invocation of the one-year limitation in 29 C.F.R. § 90.2, the regulation on which the agency relied in denying the Workers' TAA/ATAA Petition, as well as their subsequent Request for Reconsideration. *See* 72 Fed. Reg. 7907, 7909 (Feb. 21, 2007) (notice of denial of petition); 72 Fed. Reg. 15,169 (March 30, 2007) (notice of denial of request for reconsideration); 29 C.F.R. § 90.2 (specifying one-year limitation applicable in TAA/ATAA cases involving allegations of "increased imports"). However, the pertinent provision of that regulation is expressly and

---

In Steelworkers II, the Labor Department stated that it "has and continues to amend the expiration date of certifications when the facts of the case show that the later worker separations [*i.e.*, the terminations occurring after the expiration of the original certification] are *attributable to the basis for* [*the original*] *certification* (the increased imports or shift of production to a foreign country)." Steelworkers II, 33 CIT at \_\_\_\_, 2009 WL 1175654 at * 4 (emphasis added). The agency elaborated: "[I]f the [original] certification was based on a shift of production, the petitioning worker group must show that the same shift of production (same article, same country, etc.) was the basis for their separations." *Id*., 33 CIT at \_\_\_\_ n.4, 2009 WL 1175654 at * 4 n.4.

unequivocally limited – *on its face* – to cases where layoffs result from "increased imports." *See* Invista I, 33 CIT at ____, 626 F. Supp. 2d at 1307 (summarizing history of case, including Government's request for voluntary remand); 29 C.F.R. § 90.2 (specifying one-year limitation applicable in TAA/ATAA cases involving allegations of "increased imports"). Neither the Labor Department nor the Government has ever sought to argue that the agency was somehow justified in relying on that provision of the regulation in "shift of production" cases such as this. Nor could they credibly do so.[25]

In its response to the Workers' EAJA Application, the Government takes the position that such an award is not appropriate if the agency's "position at the administrative level[] *had a reasonable basis in* both *law* and fact." *See* Def.'s Response at 9-10 (emphases added). Assuming that is in fact a fair statement of the applicable standard, the Government has not made – and cannot make – the requisite showing. As outlined above, there is no dispute that the Labor Department twice rejected the Workers' claims based on an agency regulation which was, on its face, patently inapplicable to the facts of this case, while, at the same time, the agency failed over and over again to even consider (much less investigate) the possibility of amending the prior TAA/ATAA certification to extend coverage to the Workers here – the legal theory under which the Workers were ultimately certified. Given these two flagrant legal errors, there simply can be no claim that there was "a reasonable basis in . . . [the] law" for the Labor Department's position at the administrative level in this case. These grounds alone would warrant a determination that the United States' position was not substantially justified.

---

[25]As section I above explains, the Labor Department and the Government abandoned reliance on the one year limitation in 29 C.F.R. § 90.2 after this action was filed.

c.  The Record Basis for the Agency's Determinations

Other aspects of the Government's position are similarly lacking in merit.  For example, the

Government's constant refrain is that the Labor Department's three negative determinations in this

matter – *i.e.*, the agency's initial denial of the Workers' TAA/ATAA Petition, its denial of the

Workers' Request for Reconsideration, and its denial following the first (voluntary) remand – were

each "reasonably based upon evidence in the administrative record *as it existed at the time*," and that

the agency simply "examined the evidence before it" in reaching each of its determinations.  *See*

Def.'s Response at 6-7 (emphasis added).[26]  As discussed above, however, the Labor Department's

first two determinations were wrong *as a matter of law*, because they were predicated on a

regulatory provision applicable only in cases involving "increased imports."  *See* A.R. 31 (denying

TAA/ATAA Petition because Workers "were not in support of domestic production" of apparel fiber

_____

[26]*See also*, *e.g.*, Def.'s Response at 10 (arguing that "Labor examined the evidence before it"); *id*. at 11 (arguing that "Labor relied upon record evidence" to determine that Workers' terminations were not related to 2004 shift of production to Mexico); *id*. at 11 n.2 (arguing that "substantial evidence in the administrative record demonstrated that the shift of production to a foreign country was not a cause of the workers' separation"); *id*. at 12 (arguing that agency's denial of certification was substantially justified "*based upon the record before Labor at the time*") (emphasis in original); *id*. at 13 (arguing that "Labor was . . . substantially justified in relying only upon the existing evidence in the record to make its determination"); *id*. at 14 (arguing that "Labor is bound to make its decisions based upon the record before it," and that "Labor was reasonable in relying only upon the record evidence in making its determination"); *id*. at 15 (arguing that "substantial evidence supported each of Labor's determinations in this case," and that agency's determination was reasonable based "[o]n the record before Labor *at the time it made its determination*") (emphasis in original).

The Government similarly asserts that its litigation position was substantially justified, because it "relied upon the evidence in the administrative record in defending Labor's determination."  Def.'s Response at 15; *see also id*. at 16 (arguing that Government "contended that Labor's determination, *based upon the record at the time*, was supported by substantial evidence," and that Government's contentions "constituted a reasonable litigation position, given the existing record").

"within the requisite one year period"); A.R. 45-46 (denying Request for Reconsideration, and affirming basis for original denial); 29 C.F.R. § 90.2. Accordingly, at least with respect to the first two of the Labor Department's four investigations, it is of no moment whether or not the agency's determinations were, as the Government claims, "based upon [the] evidence in the administrative record as it existed at the time." *See* Def.'s Response at 6-7. As a practical matter, the Labor Department's legal error in erroneously relying on 29 C.F.R. § 90.2 rendered any facts – *i.e.*, the record evidence – immaterial.[27]

Even more fundamentally, the Government's assertion that the Labor Department's determinations were "reasonably based upon evidence in the administrative record *as it existed at the time*" (*see* Def.'s Response at 6-7 (emphasis added)) fails to take into account the Labor Department's basic, affirmative obligation to investigate TAA and ATAA claims. Nowhere does the Government recognize and address the Labor Department's bedrock obligation in TAA/ATAA cases to affirmatively *develop* the administrative record – by "marshal[ing] all relevant facts" and "conduct[ing] [its] investigation with *the utmost regard* for the interest of the petitioning workers." *See generally* section II.A.1, *supra* (summarizing, *inter alia*, agency's affirmative obligation to proactively investigate TAA/ATAA claims); 29 C.F.R. § 90.12 (requiring agency to "marshal all relevant facts" before making determinations in TAA/ATAA cases); Local 167, Int'l Molders and

---

[27]Although the Government asserts broadly that "Labor's position at the administrative level . . . [was] reasonable at each step," and that "the agency's position at the administrative level . . . [was] substantially justified" (*see* Def.'s Response at 8, 10), the Government actually does not specifically defend either the Labor Department's initial determination denying the Workers' TAA/ATAA Petition or the agency's denial of the Workers' Request for Reconsideration. A review of the substance of the Government's argument reveals that its defense of the Labor Department goes solely to the agency's initial Remand Determination. *See generally* Def.'s Response at 10-15.

Allied Workers' Union, AFL-CIO v. Marshall, 643 F.2d at 31 (emphasis added) (recognizing agency's obligation to conduct TAA investigations "with the utmost regard for the interest of the petitioning workers").

"While '[t]he EAJA does not tell an agency how to handle a case,' the agency 'cannot decline to conduct further inquiry and then plead [its] own failure to investigate as reason to conclude that [its] position was substantially justified.'" Former Employees of BMC Software, Inc. v. U.S. Sec'y of Labor, 31 CIT 1600, 1625, 519 F. Supp. 2d 1306, 1312 (2007) ("BMC II") (*quoting* Hess Mech. Corp. v. NLRB, 112 F.3d 146, 150 (4th Cir. 1997)).  That is, in essence, what the Government and the Labor Department have sought to do here, by attempting to justify the agency's determinations by relying on the administrative record "as it existed at the time," without acknowledging that the agency had an affirmative legal obligation to proactively develop that record.  The plaintiff workers in another TAA case cogently underscored this point:

> [I]t is precisely Labor's *failure to investigate* and form a sufficient record that is without substantial justification. . . .
>
> . . . If Labor could argue that its legal positions were substantially justified whenever it evaluates what is in the record, no matter how limited or inadequate that record, it would create a dangerous incentive for administrative agencies to engage in even more perfunctory investigations than is already the case. . . .
>
> This absurd result is no straw man. [The Government's] Response admits that Labor essentially chose to stay ignorant of facts that were clearly discoverable through a modicum of investigation. . . .
>
> In essence, [the Government] suggests that Labor's legal positions were substantially justified even though they relied on an administrative record that lacked essential, readily-available information, because the jobless TAA petitioners were responsible for spoon-feeding Labor . . . all relevant information.

BMC II, 31 CIT at 1625 n.27, 519 F. Supp. 2d at 1312 n.27 (emphasis and alterations in the

original).

In the case at bar, the Labor Department plainly failed to properly develop the administrative record as to the relationship between the Workers' terminations and the 2004 shift of production to Mexico. The Labor Department based its first two determinations on 29 C.F.R. § 90.2 and the agency's finding that apparel fiber had not been produced at Invista's Chattanooga plant since August 2004. As discussed above, the Labor Department's erroneous application of a "one-year rule" to these facts resulted in the wrongful denial of both the Workers' TAA/ATAA Petition and their Request for Reconsideration. *See* A.R. 31; A.R. 45-46; 29 C.F.R. § 90.2. Relying on the "one-year rule," the Labor Department therefore paid no heed to the existing record evidence that the Workers' separations were the direct result of the 2004 shift of production to Mexico (which, in turn, had led to the 2004 TAA/ATAA certification). That evidence was not controverted. *See*, *e.g.*, A.R. 2 (stating that the Workers' separations were "a continuation of the shift in production to Mexico" which was the subject of the 2004 certification).[28] Similarly uncontroverted was record evidence

---

[28]*See also*, *e.g.*, A.R. 9 (indicating that the "workers are SI [shift-impacted]" and that "[t]he shift impacted the workers"); A.R. 25 (stating that "[t]he shift in production to Mexico did broadly affect workers at the Chattanooga site"); A.R. 26 (indicating that petitioning workers "were part of the [Apparel Fibers Group] and handled sales and marketing of nylon apparel filament (a product that has not been made at the Chattanooga site since August 2004 and is made at the company's facility in Mexico)," and explaining that the petitioning workers "did not perform sales or marketing functions for the [Performance Fibers Group]"); A.R. 27 (stating that petitioning workers "performed sales and marketing for the [Apparel Fibers Group]" and had supported the workers who were covered by the 2004 TAA/ATAA certification); A.R. 35 (disputing Labor Department's determination that Workers "cannot be considered import impacted"; stating that Workers were "kept on to work while the plant was in transition," till shift of production to Mexico was complete); A.R. 36 (stating that the Workers' terminations are "a continuation of the original issue" – *i.e.*, the shift of production to Mexico; emphasizing that "[a]ll the apparel people were let go. This is a direct result of the Type 95 apparel machines going to Mexico, the loss of textile manufacturing in the U.S. the bigger picture"); A.R. 37-38 (stating that Workers' terminations are "a continuation of the original issue," *i.e.*, "the apparel machines going down to Mexico").

establishing that the Workers were being replaced by personnel in South America. *See*, *e.g.*, A.R. 2 (stating that "[t]he Customer Service Representatives (CSR's) losing their job[s] are being replaced by CSR's located in South America").[29]

When the Labor Department's request for a voluntary remand was granted (and the agency abandoned its reliance on 29 C.F.R. § 90.2 and the fact that production of apparel fibers had ceased at the Chattanooga facility more than one year before the Workers' terminations), the Labor Department assertedly sought to focus for the first time on the relationship between the Workers' termination and the 2004 shift of production to Mexico. However, rather than analyzing and further developing the existing ample and uncontroverted record evidence on that point (summarized above), the Labor Department instead opted to premise its remand determination largely on the negative response of an Invista lawyer[30] to a single question which was framed in terms of the "ultimate fact" to be determined by the agency: "Was the business decision to reorganize the Customer Service Organization [which led to the separation of the Workers here] the result of the

---

[29]*See also* A.R. 3 (explaining that Workers "are being replaced by Customer Service Representatives who are located in South America"); A.R. 21 (stating that "all of the Apparel Customer Service Representatives jobs are going away"); A.R. 29 (noting that Invista official stated that the Workers' positions "were outsourced to Brazil"); A.R. 36 (explaining that, although signatory Worker "was downsized, . . . there were people hired in Brazil to do [her] work"); A.R. 37 (stating that Worker was informed that her job "was being split up; part of it going to Brazil"); A.R. 38 (indicating that, although signatory Worker "was downsized, . . . there were people hired in Brazil to do [the] jobs" that she and her co-Workers had previously done).

[30]The Government refers broadly to this source as "management at Invista," although her title is "Senior Counsel, Labor and Employment." *Compare* Def.'s Response at 11, *and* S.A.R. 6. Neither the Labor Department nor the Government offers any explanation as to why the agency did not accord "management" weight to the statement of the Chattanooga Plant Manager, who – unlike the senior staff attorney here – was clearly part of the ranks of Invista "management," and who attested under oath that the Workers' termination was "a continuation of the [2004] shift in production to Mexico." *See* A.R. 2.

shift of production [to Mexico] two years earlier?"  *See* S.A.R. 17-18; 73 Fed. Reg. at 32,739-40.[31]

In short, notwithstanding its obligations to conduct its investigation with "the utmost regard" for the interests of the Workers and to "marshal all relevant facts" in reaching its determination on the Workers' TAA/ATAA Petition, the Labor Department ignored all other (previously uncontroverted) evidence of the causal relationship between the Workers' termination and the 2004 shift of production to Mexico, and instead chose to rely on the Invista lawyer's conclusory response to a single question as a basis for denying the Workers' claims yet again.  *See* 73 Fed. Reg. at 32,739-40 (concluding that Invista's "shift of nylon apparel filament production to Mexico was not

---

[31]In contrast to the information provided by others (summarized in the text and in notes 28 and 29 above), which indicated that  the Workers' terminations indeed were attributable to the 2004 shift of production to Mexico (and, further, that employees in Brazil and elsewhere had taken over the Workers' jobs), the Invista lawyer stated:

> The decision to reorganize the customer service organization was not connected to the decision made in 2004 to stop production of Nylon Apparel at the Chattanooga Site.  It was a business decision to improve the efficiency of the customer service organization.  The Apparel Nylon customer service work was being performed at four locations, Canada, South America, Wilmington, and Chattanooga.   The customer service work was consolidated to two (2) locations; Wilmington, Delaware, and at the Apparel Nylon Site in Paulinia, Brazil.

S.A.R. 18.

The Government insists that "Labor's reliance upon these facts [as set forth by Invista's lawyer] was reasonable, and *based upon the record before Labor at the time*, Labor's determination that plaintiffs were ineligible for TAA was substantially justified."  *See* Def.'s  Response at 11-12 (emphasis in the original).  By its use of emphasis in the quoted sentence, the Government implicitly acknowledges that the Labor Department later reversed its position, and determined that the Workers' terminations were in fact attributable to the 2004 shift of production to Mexico.  However, the Government fails to acknowledge that there was ample evidence on point which was already on the record at the time that Invista's lawyer gave her conflicting statement.  And certainly the Government cites no authority which would suggest that the Labor Department was free to simply turn a blind eye to that earlier, contrary evidence.

a factor in the subject workers' separations").

Incredibly, *even now*, the Government maintains that there was "no record evidence, at the time, to contradict [the] statement [of the Invista lawyer]." *See* Def.'s Response at 13; *see also id*. at 12 (asserting that, at the time that the Invista lawyer made her statement, "it was not contradicted by any other evidence"). As discussed at some length herein, the statement of the Invista lawyer was squarely contradicted by much of the other record evidence on point – including, in particular, the sworn statement of Invista's Chattanooga Plant Manager. *See* A.R. 2. If – as the Government says – "Labor found no record evidence, at the time, to contradict [the] statement [of the Invista lawyer]" (*see* Def.'s Response at 13), then the agency simply was not looking. *Cf*. Joy Techs., 31 CIT at 1839-41, 1843, 1846, 523 F. Supp. 2d at 1375-76, 1378, 1379-80 (criticizing agency for failing to recognize as "record evidence" statements submitted by petitioning workers addressing, *inter alia*, facts surrounding shift of production to Mexico).[32]

_____

[32]It is frankly difficult to know what to make of the Government's outlandish assertion that, at the time that the Invista lawyer made her statement, "it was not contradicted by any other evidence." *See* Def.'s Response at 12. The Government fails even to acknowledge, much less seek to explain, the patent conflict between the statement of the Invista lawyer and the statement of Invista's Chattanooga Plant Manager. *Compare* S.A.R. 18 (statement of Invista lawyer that Workers' terminations were "not connected to the decision made in 2004 to stop production of Nylon Apparel at the Chattanooga Site," but were instead the result of "a business decision to improve the efficiency of the customer service organization") *and* A.R. 2 (sworn statement of Invista's Chattanooga Plant Manager that Workers' terminations were "a continuation of the [2004] shift in production to Mexico").

It is also worth noting that the administrative record indicates that the Labor Department never sought to contact Invista's Chattanooga Plant Manager to follow up on his statement, made under oath, that the Workers' terminations were "a continuation of the [2004] shift in production to Mexico." A.R. 2. The Invista Plant Manager's statement was unambiguous and unequivocal; and, as discussed elsewhere herein, it was corroborated by other statements of the Workers and other Invista representatives. If the Labor Department did not understand the gist of those statements, the agency was duty-bound to inquire further. Petitioning workers in TAA/ATAA cases have no

In any event, the Labor Department made no attempt to confront the Invista lawyer with the ample record evidence tying the Workers' terminations to the 2004 shift of production to Mexico. The Invista lawyer thus had no opportunity to refine or clarify her statement to the agency; and the Labor Department had no basis for reconciling her statement with the numerous earlier statements to the contrary. Similarly, the Labor Department made no effort to use the statement of the Invista lawyer to confront those who had earlier given the agency statements linking the Workers' separations to the 2004 shift of production. Those individuals therefore had no opportunity to refine or clarify their statements, and the Labor Department had no basis for reconciling their statements with the conflicting statement given by the Invista lawyer. *See generally* Invista I, 33 CIT at ____ n.6, 626 F. Supp. 2d at 1310 n.6 (criticizing agency for failure to "confront sources with conflicting information provided by others," thereby "depriving [the sources] of the opportunity to clarify discrepancies, and diminishing the usefulness of the information elicited by the agency").[33]

In short, not only did the Labor Department fail to state on the record any rationale for privileging the single, conclusory statement made by the Invista lawyer over the numerous

---

obligation to "spoon feed" the Labor Department and serve up evidence "on a silver platter." *See*, *e.g.*, Former Employees of IBM Corp., Global Services Division v. U.S. Sec'y of Labor, 29 CIT at 956, 387 F. Supp. 2d at 1351 (rejecting Labor Department's argument that, because petitioning workers did not allege certain facts, agency was not obligated to make further inquiry; holding that, to the contrary, because petitioning workers cannot reasonably be expected to have knowledge of the "sometimes esoteric criteria" for TAA certification, "it is incumbent upon Labor to take the lead in pursuing the relevant facts"); BMC II, 31 CIT at 1625 n.27, 519 F. Supp. 2d at 1312-13 n.27 (rejecting notion that "jobless TAA petitioners were responsible for spoon-feeding Labor") (internal quotation marks and citation omitted).

[33]*See also*, *e.g.*, Welex, 32 CIT at ____, 2008 WL 7020688 at * 9 (criticizing agency for failure to confront sources with contrary information, depriving sources of opportunity to clarify inconsistencies and discrepancies in record); Elec. Mobility Corp., 32 CIT at ____, 2008 WL 7020689 at * 5 (same).

statements to the contrary given by other individuals, but – in fact – the administrative record is devoid of anything on which the agency could have based such a statement of rationale. In TAA/ATAA investigations, the Labor Department is obligated to develop a proper record by seeking to reconcile conflicting evidence on key points before the agency reaches a determination on petitioning workers' claims. *See* Welex, 32 CIT at ____, 2008 WL 7020688 at * 9-11 (faulting agency for its failure to identify and resolve discrepancies and inconsistencies in record evidence); Former Employees of Elec. Mobility Corp. v. U.S. Sec'y of Labor, 32 CIT ____, ____, 2008 WL 7020689 at * 4-6 (2008) (same); BMC I, 30 CIT at 1335-39, 454 F. Supp. 2d at 1324-28 (same).[34] Further, contrary to the Government's implication, no agency is free to pick and choose, willy-nilly, the evidence on which it will rely to reach a key determination without offering at least *some* explanation of the basis for its decision to credit certain information over other conflicting evidence in the administrative record. *See generally* Invista I, 33 CIT at ____ n.6, 626 F. Supp. 2d at 1310 n.6 (criticizing "the agency's failure to explain why it credited some sources of information and rejected other information"); Former Employees of Int'l Business Machines Corp. v. U.S. Sec'y of Labor, 31 CIT 463, 508-10, 483 F. Supp. 2d 1284, 1324-26 (2007) ("IBM II") (emphasizing that, in reaching TAA/ATAA determination, "substantial evidence" standard requires agency to take into

---

[34]*See also*, *e.g.*, Former Employees of Tyco Electronics v. U.S. Dep't of Labor, 27 CIT 685, 694, 264 F. Supp. 2d 1322, 1330 (2003) (indicating that agency should take steps to "resolve any inconsistencies" between information provided by petitioning workers and that provided by employer); Former Employees of Tyco Electronics v. U.S. Dep't of Labor, 28 CIT 1571, 1576, 1584, 1588-89, 350 F. Supp. 2d 1075, 1081, 1087, 1091 (2004) (awarding attorneys' fees and expenses under EAJA, finding Government's litigation position not "substantially justified," based, *inter alia*, on Government's reliance in litigation on record where agency had failed to "resolve the seemingly contradictory information provided by [the employer]" and had failed to "resolve any inconsistencies" in record evidence).

consideration all evidence that "fairly detracts" from its determination) (discussing <u>Consol. Bearings Co. v. United States</u>, 412 F.3d 1266, 1269 (Fed. Cir. 2005); <u>Gerald Metals, Inc. v. United States</u>, 132 F.3d 716, 720 (Fed. Cir. 1997)); <u>Inter-Neighborhood Hous. Corp. v. NLRB</u>, 124 F.3d 115, 122 (2d Cir. 1997) (finding lack of substantial justification where, in declining to investigate further, agency investigator must have concluded that a witness was lying and falsifying documents, but where administrative record included "no basis for such conclusions").

Moreover, it is manifestly clear that there is no reason why the Labor Department could not have earlier obtained the information on which it ultimately based its certification of the Workers here. The evidence which caused the agency to reverse course (and thus to certify the Workers) was information supplied in an August 2009 phone conversation between agency staffers and Invista's former Chief Legal Counsel for Labor and Employment (who, in 2008, had become Associate General Counsel for Labor and Employment at a Koch "shared service organization" supporting Invista and other Koch-affiliated companies). *See* S.S.A.R. 69-70. However, that conversation simply reaffirmed what the Workers (and, indeed, several representatives of Invista, including Invista's Chattanooga Plant Manager) had been telling the agency all along – that is, that the Workers' terminations "were a direct (albeit delayed) result of the 2004 shift of apparel fiber production to Mexico." *See* <u>Invista II</u>, 33 CIT at ____, 657 F. Supp. 2d at 1364. Nothing in that August 2009 phone conversation should have been a revelation to the Labor Department. Indeed, the information provided in the phone conversation was almost entirely cumulative of other evidence in the record, dating back to the initiation of the original investigation.[35] Nowhere does either the

---

[35]*Compare*, *e.g.*, S.S.A.R. 69-70 (summarizing Aug. 21, 2009 phone conversation between agency staff and Associate General Counsel for Labor and Employment at Koch "shared service

Labor Department or the Government identify any "new information" garnered in that conversation which the agency could not have obtained much earlier. *See*, *e.g.*, Pierce v. Underwood, 487 U.S. at 560 (explaining that, in evaluating "substantial justification," trial court is entitled to take into consideration "insights not conveyed by the record," including "whether critical facts could easily have been verified by the Government"); *see also* section II.A & n.11, *supra* (collecting additional cases on point).[36]

### d. The Agency's Delegation of Authority

Invista I identified other significant flaws in the Labor Department's investigation as well. *See generally* Invista I, 33 CIT at ____, 626 F. Supp. 2d at 1310-11. As the Government notes, for example, Invista I criticized the Labor Department for – in essence – "delegat[ing] to the Invista

organization"), *with* A.R. 2 (sworn statement of Invista's Chattanooga Plant Manager, attesting that Workers' termination was "a continuation of the [2004] shift in production to Mexico," and that the work was now being done by personnel "located in South America"), and other evidence cited in nn.28-29 (summarizing record evidence indicating that Workers' termination was attributable to 2004 shift of production, as well as record evidence that Workers' customer service duties were assumed by personnel in Brazil).

[36]Indeed, it is clear beyond cavil that the Labor Department could have reached its affirmative determination much earlier, if the agency had relied on the ample evidence in the existing administrative record (which, after all, included not only statements by the Workers, but also the *sworn statement* of *a senior Invista official*), rather than seeking to elicit other information from the Invista lawyer. *See*, *e.g.*, A.R. 2 (TAA/ATAA Petition, filed by Invista's Chattanooga Plant Manager, attesting under oath that Workers' termination was "a continuation of the [2004] shift in production to Mexico"); *see also* nn.28-29 (summarizing record evidence indicating that Workers' termination was attributable to 2004 shift of production, as well as record evidence that Workers' customer service duties were assumed by personnel in Brazil). In the alternative, the Labor Department could have reached its affirmative determination much earlier if – after the agency received the conflicting information from the Invista lawyer – the agency had proceeded to further probe the matter, in an effort to reconcile the newly-created inconsistencies in the record evidence in a timely fashion, before rendering yet another negative determination on the Workers' claims.

[lawyer] the power to decide the Workers' TAA/ATAA petition." *See* Def.'s Response at 12; Invista I, 33 CIT at ____, 626 F. Supp. 2d at 1310. After referring to that criticism in Invista I, however, the Government proceeds to brief an entirely different matter. In other words, in its Response, the Government completely misses the point. Rather than arguing whether it is permissible for the Labor Department to (in effect) base its determination in a TAA/ATAA case on a source's conclusory response to the "ultimate question" (which is the "delegation" concern to which the Government briefly refers), the Government's Response instead proceeds to argue that the Labor Department was entitled to rely on statements made by representatives of the Workers' former employer. That is a different issue.

The confusion on the part of the Government leaves uncontested and intact Invista I's conclusion that "[t]he Labor Department erred by substituting [the Invista lawyer's] conclusory opinion for [the agency's] own probing inquiry into all the relevant underlying facts concerning the relationship between the 2004 shift in production to Mexico and the Workers' subsequent terminations." *See* Invista I, 33 CIT at ____, 626 F. Supp. 2d at 1310. As Invista I explained, the only real issue for decision by the Labor Department in this case was whether the Workers' termination was "attributable to" the 2004 shift of production to Mexico (*i.e.*, the basis for the 2004 TAA/ATAA certification). Thus, by asking the Invista lawyer whether the company's "business decision" to reorganize its customer service organization and terminate the Workers was "the result of the shift of production two years earlier":

> . . . the Labor Department, in effect, asked the Invista [lawyer] . . . the "ultimate question." In essence, the agency delegated to the Invista representative the power to decide the Workers' TAA/ATAA petition. But "it is Labor's responsibility, not the responsibility of [a] company official, to determine whether a former employee is eligible for [TAA/ATAA] benefits."

Invista I, 33 CIT at ____, 626 F. Supp. 2d at 1310 (*quoting* BMC I, 30 CIT at 1340, 454 F. Supp. 2d at 1328 (quotation omitted)). The same agency practice has been roundly condemned in a number of other cases as well. *See*, *e.g.*, BMC I, 30 CIT at 1339-41, 454 F. Supp. 2d at 1328-29 (cataloguing wide range of TAA/ATAA opinions criticizing agency for phrasing questions posed to sources/contacts in terms of "ultimate facts," and thereby – in effect – impermissibly delegating the agency's power to decide petitioning workers' claims and abdicating agency's responsibility to conduct its own independent factual investigations and to reach its own independent legal conclusions).[37]

### e. The Agency's Reliance on Invista's Lawyer's Statement

Rather than briefing the "delegation" issue which it raises, the Government invokes Court of Appeals precedent including Barry Callebaut and Marathon Ashland Pipe Line, and argues at some length that the Labor Department was entitled to rely on the statement of the Invista lawyer to conclude (in the course of the voluntary remand proceeding) that the Workers were not entitled to TAA/ATAA certification. *See generally* Def.'s Response at 12-13 (*citing* Former Employees of Barry Callebaut v. Chao, 357 F.3d 1377 (Fed. Cir. 2004); Former Employees of Marathon Ashland Pipe Line, LLC v. Chao, 370 F.3d 1375 (Fed. Cir. 2004)). The Government's argument misses the mark, in several significant respects.

---

[37]*See also*, *e.g.*, Independent Steel Castings Co., 31 CIT at 1176-77 (explaining that "Labor 'cannot simply adopt as its own the legal conclusions of employers . . . . Rather, the agency must reach its own conclusions, based on its own thoughtful, thorough, independent analysis of all relevant record facts.'") (*quoting* IBM I, 29 CIT at 1382, 403 F. Supp. 2d at 1331); *id.* (noting that "'it is Labor's responsibility, not the responsibility of [a] company official, to determine whether a former employee is eligible for benefits'") (*quoting* Former Employees of Federated Merch. Group v. United States, 29 CIT 137, 144 (2005)).

First, although decisions in some other TAA/ATAA cases have criticized the Labor Department's tendency to accept on faith virtually anything an employer says (while discounting or disregarding the information provided by petitioning workers), that specific criticism was not raised in either Invista I or Invista II. *Compare*, *e.g.*, Welex, 32 CIT at ____, 2008 WL 7020688 at * 11-12 (analysis captioned "The Labor Department's Over-Reliance on Employer-Provided Information"); BMC I, 30 CIT at 1339-49, 454 F. Supp. 2d at 1328-37 (same); *with* Invista I, 33 CIT ____, 626 F. Supp. 2d 1301, *and* Invista II, 33 CIT ____, 657 F. Supp. 2d 1359. The Government's argument thus targets a "straw man."[38]

Moreover, contrary to the Government's implications, Barry Callebaut and Marathon Ashland Pipe Line have little (if any) application here, given the circumstances of this case. As the Government emphasizes, the Court of Appeals concluded in Barry Callebaut and Marathon Ashland Pipe Line that the Labor Department is entitled to rely upon information provided by the former employers of petitioning workers in TAA/ATAA cases – but only where (1) "the Secretary reasonably concludes that [the employer's] statements are creditworthy," and (2) the employer's statements "are not contradicted by other evidence." *See* Def.'s Response at 12-13 (*quoting* Marathon Ashland Pipe Line, 370 F.3d at 1385 (*citing* Barry Callebaut, 357 F.3d at 1383)) (internal quotation marks omitted) (alteration in original).

Neither condition is met in this case. As discussed in some detail above, the administrative record is devoid of any explanation to support a Labor Department conclusion that the statement of

---

[38]In other words, the focus of the "delegation" concern expressed in Invista I and Invista II goes to the form or phrasing of questions posed by the Labor Department, rather than the identities or affiliations of the sources to whom the questions are put.

the Invista lawyer was – in the words of the Court of Appeals – "creditworthy."  And, even more

to the point (and the Government's assertions notwithstanding), the statement of the Invista lawyer

was indisputably "contradicted by other evidence" already in the administrative record.[39]

The Government inexplicably asserts that, at the time it was made, the statement of the

Invista lawyer "was not contradicted by any other evidence."  *See* Def.'s Response at 12; *see also*

*id*. at 13 (asserting that there was "no record evidence, at the time, to contradict Invista's

statement").  To the contrary, that statement was in direct conflict with ample existing record

evidence that the Workers' terminations were directly attributable to the 2004 shift of production

to Mexico – including, most notably, the sworn statement of Invista's own Chattanooga Plant

Manager.  In the TAA/ATAA Petition itself, the Invista Plant Manager attested in no uncertain terms

that the Workers' separations were "a continuation of the [2004] shift in production to Mexico"

(which, in turn, had led to the 2004 TAA/ATAA certification).  *See* A.R. 2 (statement of Invista's

Chattanooga Plant Manager, made under oath/affirmation, including warning of federal penalties

for, *inter alia*, violations of federal material false statements statute; declaring "[u]nder penalty of

law, . . . that to the best of [his] knowledge and belief the information . . . provided is true, correct

and complete"); *see also id*. (further attesting that the Workers "losing their job[s] are being replaced

---

[39]It is also noteworthy that, at least in <u>Barry Callebaut</u>, the employer's statements were sworn.  *See* <u>Barry Callebaut</u>, 357 F.3d at 1383 (quoting oaths included with affidavits of three company executives).  In contrast, in the case at bar, the statement of the Invista lawyer was not made under any sort of oath or affirmation.  Indeed, the sole record evidence in this case that is under oath is the statement of Invista's Chattanooga Plant Manager – and, as discussed elsewhere herein, the Plant Manager stated flatly and unequivocally that the terminations of the Workers at issue were "a continuation of the [2004] shift in production to Mexico," and that the Workers "losing their job[s] [were] being replaced by CSR's [Customer Service Representatives] located in South America."  *See* A.R. 2.

by CSR's [Customer Service Representatives] located in South America").[40]

Under these circumstances, it is difficult enough to fathom how the Labor Department could ignore the ample record evidence existing at the time, and – without seeking to reconcile the contradictory accounts – simply choose to credit the conflicting statement given by the Invista lawyer. But the repeated assertions in the Government's Response that there was "no record evidence, at the time, to contradict Invista's [lawyer's] statement" are simply baffling.

In sum, Marathon Ashland Pipe Line and Barry Callebaut afford the Labor Department and the Government no refuge, given the circumstances of this case. *See* Marathon Ashland Pipe Line, 370 F.3d at 1385; Barry Callebaut, 357 F.3d at 1383. Nothing in either of those cases excuses the Labor Department from explaining its decision to rely on certain information and to disregard other conflicting information. Indeed, the Court of Appeals emphasized that "the Secretary [must] reasonably conclude[] that [the employers'] statements are creditworthy." *See* Def.'s Response at 12-13 (*quoting* Marathon Ashland Pipe Line, 370 F.3d at 1385 (*citing* Barry Callebaut, 357 F.3d at 1383)) (internal quotation marks omitted) (alteration in original). And, further, nothing in either of those cases authorizes the Labor Department to rely on the statements of employers where – as here – those statements "are . . . contradicted by other evidence" in the record. *See id*. (*citing* Barry Callebaut, 357 F.3d at 1383).[41]

---

[40]Other record evidence to the same effect is summarized in notes 28 and 29, above.

[41]*See also*, *e.g.*, Joy Techs., 31 CIT at 1839-41, 1843, 1844-46, 523 F. Supp. 2d at 1375-76, 1378, 1379-80 (castigating Labor Department for arguing that agency is entitled to base a TAA determination on "unverified" statements of petitioning workers' former employer where employer's statements were contradicted by other evidence in the record, and for failing to recognize as "record evidence" statements submitted by petitioning workers).

f.  The Agency's Reliance on Other Evidence

In arguing that the Labor Department was entitled to rely on the statement of the Invista lawyer because that statement was – according to the Government – not contradicted by other evidence (an argument that is disposed of immediately above), the Government alludes in passing to "other record evidence that [the Labor Department] deemed creditworthy," which the agency cited in an effort to buttress the conclusion in its initial Remand Determination that the Workers' terminations were not related to the 2004 shift of production to Mexico.  *See* Def.'s Response at 13 (alluding to 73 Fed. Reg. at 32,739-40).  But Invista I expressly and painstakingly addressed that evidence.  *See* Invista I, 33 CIT at ____, 626 F. Supp. 2d at 1311.  And, significantly, neither the Labor Department nor the Government has ever called into question any aspect of that part of the analysis in Invista I.[42]

_____

[42]Specifically, the Labor Department's initial Remand Determination asserted that "two of the four separated workers worked on a product line (Performance Materials) whose production was not shifted to Mexico."  *See* 73 Fed. Reg. at 32,739.  However, as Invista I explained, "the evidence on that point . . . is in conflict and unclear (and, in any event, obviously says nothing about the terminations of the two other workers)."  *See* Invista I, 33 CIT at ____, 626 F. Supp. 2d at 1311.

The Labor Department's conclusion that two of the Workers were employed solely in "Performance Materials" and had no relationship to "Apparel Fibers" (the line of production which was shifted to Mexico in 2004) was squarely at odds with much of the record evidence – including essentially *all* of the record evidence compiled up to the voluntary remand proceeding.  *See* A.R. 1-2 (attesting that termination of four Workers – *i.e.*, "3-Customer Service Representatives, 1-Product Coordinator" – was "a continuation of the [2004] shift in production to Mexico"); A.R. 21 (indicating that one named Worker was "previous vacation relief," and another named Worker was "current vacation relief" up to date of termination); A.R. 21 (explaining that the Workers could "relieve each other if one [was] on vacation, but they [were] not capable . . . of performing other functions," and that, as of the date of terminations "there [were] no job openings . . . at [the] Chattanooga site, . . . and all of the Apparel Customer Service Representatives jobs are going away"); A.R. 26 (stating that the petitioning Workers "were part of the Nylon Apparel Filament Fibers Group," and that they "did not perform sales or marketing functions for the Nylon Performance Filament Fibers Group"); A.R. 27 (stating that the Workers "performed sales and

marketing for the Nylon Apparel Filament Fibers Group," and had worked "in support of the production workers previously certif[ied]" under the 2004 TAA/ATAA certification); A.R. 28-29 (indicating that Workers "were engaged in" and "were responsible for sales and marketing activities of nylon apparel filament fibers," and that "[t]he Nylon Apparel Filament Fibers Group were not engaged in the production of nylon performance filament fibers, nor did they support [such] production"); A.R. 36 (noting that one named Worker "was vacation relief for the apparel sales group," and explaining how other workers who were originally working in Performance Fibers were displaced to allow the company to give their jobs to more senior Apparel Fibers personnel, and were consequently terminated as "a direct result of the . . . apparel machines going to Mexico"); S.A.R. 8 (indicating that November 2006 reorganization of Invista's Customer Service Organization resulted in termination of "two (2) Apparel Nylon Customer Service Representatives located at Chattanooga, one (1) Performance Materials Customer Service Representative located at Chattanooga, and one (1) Performance Materials Product Coordinator located at Chattanooga"); S.A.R. 11 (indicating that named individual "supervised 2 apparel nylon customer service representatives and 1 performance materials customer service representative at Invista's Chattanooga, TN facility . . . , that the work that the 2 apparel nylon customer service representatives performed [was] split between an existing production facility in Delaware . . . and an existing production facility in Brazil . . . , that the 2 apparel nylon customer service representatives sold nylon yarn produced in Mexico . . . The work that was performed by the performance materials customer service representative stayed . . . [at the Chattanooga plant] but the worker was let go as part of the reorganization of work"); S.A.R. 18 (stating that "[t]he decision to reorganize the customer service organization was not connected to the decision made in 2004 to stop production of Nylon Apparel at the Chattanooga Site. It was a business decision to improve the efficiency of the customer service organization. . . . The decision [to consolidate the customer service organization] was made in November, 2006. In the following weeks, it was determined that two (2) Apparel Nylon Customer Service Representatives, one (1) Performance Materials Customer Service Representative, and [o]ne (1) Performance Materials Product Coordinator located at Chattanooga would not be retained"); S.A.R. 19 (identifying by name the four individual Workers at issue); S.A.R. 21 (indicating that responsibilities of named Worker included, *inter alia*, "servicing . . . customers buying Invista SARL nylon Apparel yarns"); S.A.R. 22 (indicating that responsibilities of named Worker included, *inter alia*, serving as "Customer Service Representative" and providing "Vacation relief for Chattanooga based CSR [Customer Service Representative] team," including both "Apparel and Performance Fibers"); S.A.R. 23 (indicating that named Worker was employed as "Customer Sales Specialist"); S.A.R. 24 (indicating that named Worker was employed as "Product Coordinator – Nylon 2005 R.R.E.").

The record reveals that – in reaching its first Remand Determination – the Labor Department made no effort to reconcile the glaring inconsistencies in the evidence concerning the petitioning Workers' job responsibilities, their relationship (if any) to the production of apparel fiber, and the connection (if any) between the Workers' terminations and the 2004 shift of the production of apparel fiber to Mexico. For example, the agency ignored evidence indicating that some of the

————————————————

Workers who had responsibilities related to the production of performance materials in fact also had links to the production of apparel fiber, and thus were terminated as a result of the 2004 shift of production of apparel fiber to Mexico. *See*, *e.g.*, A.R. 21 (including, *inter alia*, discussion of "vacation relief" responsibilities); A.R. 36 (discussing, *inter alia*, "vacation relief" responsibilities, as well as displacement of Performance Materials personnel to create position in Performance Materials for Apparel Fibers supervisor, to avoid termination of that supervisor). Nor did the Labor Department offer any justification for its selective reliance on certain evidence, and its complete disregard for contrary record evidence. In any event, the Labor Department's eventual amendment of the 2004 TAA/ATAA certification to cover the Workers here reflects the fact that the agency ultimately concluded that the Workers' terminations indeed were attributable to the 2004 shift of production to Mexico. *See* 74 Fed. Reg. 51,195 (Second Remand Determination).

The second piece of ostensibly corroborating evidence cited in the Labor Department's initial Remand Determination was the fact that more than two years elapsed between the 2004 shift of manufacturing operations to Mexico and the terminations of these Workers. *See* 73 Fed. Reg. at 32,739-40. But, as Invista I explained, "that is the very point of the Labor Department's procedure for amending TAA/ATAA certifications to extend the expiration period: The Labor Department has implicitly recognized that, in certain cases, the employment of some trade-impacted workers may extend for a time beyond the presumptive two-year period reflected in the agency's standard TAA/ATAA certification." *See* Invista I, 33 CIT at ____, 626 F. Supp. 2d at 1311. Again, the fact that the Labor Department finally amended the 2004 TAA/ATAA certification to cover the Workers here demonstrates that the agency ultimately concluded that, notwithstanding the delayed timing of the Workers' terminations, those terminations in fact were attributable to the 2004 shift of production to Mexico. *See* 74 Fed. Reg. 51,195 (Second Remand Determination).

As its third and final piece of corroborating evidence, the Labor Department noted in its initial Remand Determination that the Workers were replaced not by personnel in Mexico, but instead by workers in Brazil and elsewhere. *See* 73 Fed. Reg. at 32,739-40. But, as Invista I explained, the Labor Department's observation missed the point:

> The gravamen of the Workers' case is that, if production had not been shifted to Mexico in 2004 (but rather had continued at the Chattanooga plant), the Workers would still have their jobs supporting domestic production. Nothing in law or logic requires that the Workers' jobs necessarily have shifted to Mexico [the new locus of production]. Under the Labor Department's own standards, if there is a "causal nexus" between the 2004 shift in production and the Workers' terminations, they are entitled to certification.

Invista I, 33 CIT at ____, 626 F. Supp. 2d at 1311. Once more, the fact that the Labor Department finally amended the 2004 TAA/ATAA certification to cover the Workers here demonstrates that the agency ultimately concluded that, although the Workers' jobs shifted to Brazil and elsewhere, the

g.  The Record Basis for Invista I

The Government's final point in support of its claim that the Labor Department's conduct

in this matter was "substantially justified" focuses on a specific point made in Invista I.  Criticizing

the Labor Department for its failure to probe the facts underpinning the Invista lawyer's statement

that the reorganization of the company's customer service organization and the resulting

terminations of the Workers at issue were based on "a business decision to improve . . . efficiency,"

and were wholly unrelated to the 2004 shift of production to Mexico, Invista I explained:

> [T]here is a false dichotomy embodied in the Labor Department's conclusion that the
> Workers' terminations "[were] not related to the shift in production of apparel nylon
> filament to Mexico in 2004," but were instead the result of "a business decision to
> improve the efficiency of . . . [Invista's] customer service organization."  *See* 73 Fed.
> Reg. at 32,739-40.  As a matter of pure logic, the fact that a company states that
> layoffs are part of a plan to "increase efficiency," "restructure," or "save money"
> says nothing about whether or not those layoffs are attributable to effects of
> international trade.  As a general principle, companies are obviously *always* striving
> to operate in an efficient and cost-effective manner.  *No doubt the 2004 shift in*
> *production was the result of a* "*business decision*" *designed to* "*increase efficiency*,"
> "*restructure*," *and* "*save money*" *in the manufacture of apparel fiber.  But the driving*
> *force behind that* "*business decision*" *was unquestionably foreign competition.*
>
> The Labor Department cannot premise its determinations in TAA/ATAA cases on
> conclusory assertions about companies' "business decisions" or on euphemisms such
> as "enhanced competitiveness" and "increased efficiency."  For purposes of a
> TAA/ATAA analysis, the relevant question as to any asserted "business decision"
> is: *Why*?  In this case, why did Invista feel the need to "improve the efficiency" of
> its customer service organization, and how (if at all) was it related to the 2004 shift
> in production to Mexico (or otherwise related to the pressures of foreign
> competition)?

Invista I, 33 CIT at _____, 626 F. Supp. 2d at 1310-11 (*citing* BMC I, 30 CIT at 1338 n.32, 454 F.

Supp. 2d at 1326-27 n.32; IBM II, 31 CIT at 520-22 n.72, 483 F. Supp. 2d at 1334-35 n.72) (initial

---

Workers' terminations nevertheless were attributable to the 2004 shift of production to Mexico.  *See*
74 Fed. Reg. 51,195 (Second Remand Determination).

and final alterations in the original).

In its Response, the Government focuses on the two sentences highlighted at the end of the first paragraph quoted immediately above, and implies that Invista I unfairly criticized the Labor Department by (in essence) looking beyond the administrative record as it then existed. *See* Def.'s Response at 16 (arguing that United States' position was "substantially justified" because Government "relied upon the statutory standard that a review of a negative TAA determination is based solely upon the facts in the administrative record before the Court and nothing else"); *id*. at 14 (same). Specifically, the Government protests that "there was nothing in the record before Labor [at the time of the voluntary remand] to suggest that the driving force behind Invista's decision [to terminate the Workers] was competition from Mexico." *See* Def.'s Response at 13-14. But there are at least three problems with the Government's position.

First and foremost, if the Government had read the relevant part of Invista I (quoted above) carefully and completely, the Government would have realized that the excerpt on which it relies (italicized in the quotation above) clearly refers *not* to the basis for the termination of the instant Workers, but – rather – to the basis for the 2004 shift of production to Mexico. And there has never been any doubt in this case that the 2004 shift of production was the result of foreign competition (*i.e.*, cheaper production costs abroad). The Labor Department's 2004 TAA/ATAA certification was predicated on that fact. *See* A.R. 5-6 (2004 TAA/ATAA certification granted based on finding of shift of production to Mexico); 69 Fed. Reg. 54,320 (same). The question presented in this case was the relationship, if any, between the 2004 shift of production to Mexico (which led to the 2004 TAA/ATAA certification) and the termination of the Workers here. *See*, *e.g.*, Steelworkers II, 33 CIT at ____, 2009 WL 1175654 at * 4 (quoting Labor Department's statement that it "has and

continues to amend the expiration date of certifications when the facts of the case show that the later worker separations [*i.e.*, the terminations occurring after the expiration of the original certification] are *attributable to the basis for* [*the original*] *certification* (the increased imports or shift of production to a foreign country)" (emphasis added)).

The Government's Response is therefore patently wrong to the extent that the Government asserts that Invista I concluded that "the driving force" behind the termination of the Workers here "was undoubtedly foreign competition." *See* Def.'s Response at 13-14.  Quite apart from the plain text of the two sentences themselves (which, on their face, clearly address the reasons for the 2004 shift of production to Mexico, and say nothing about the reasons for the termination of these Workers), the paragraph immediately following the highlighted passage further underscores the fact that Invista I left open the question of the relationship, if any, between the Workers' termination and foreign competition, asking: "*Why*?  In this case, why did Invista feel the need to 'improve the efficiency' of its customer service organization, and how (if at all) was it related to the 2004 shift in production to Mexico (or otherwise related to the pressures of foreign competition)?" *See* Invista I, 33 CIT at ____, 626 F. Supp. 2d at 1311.  The Government's claim that Invista I looked beyond the then-existing administrative record is thus entirely lacking in merit.

The Government's argument is equally wrong to the extent that the Government contends that – until the final remand, when the Labor Department certified the Workers – the record was devoid of evidence on which the agency could have based a determination that the termination of the Workers here was attributable to the 2004 shift of production to Mexico.  *See* Def.'s Response at 13-14 (asserting that, until the final remand, "there was nothing in the record before Labor to suggest that the driving force behind Invista's decision" to reorganize its customer service workforce

and terminate the Workers was foreign competition); *see also id.* (arguing that the agency "was. . . substantially justified in relying only upon the existing evidence in the record to make its determination," and that "Labor is bound to make its decisions based on the record before it"). Quite to the contrary, as discussed in some detail above, there was in fact ample record evidence – beginning with the filing of the TAA/ATAA Petition itself – to support an agency determination that the Workers' terminations were attributable to the 2004 shift of production to Mexico. *See* A.R. 2 (Invista Plant Manager attesting under oath that Workers' termination was "a continuation of the [2004] shift in production to Mexico"); *see also* nn.28-29, *supra* (surveying record evidence in Administrative Record and Supplemental Record indicating that Workers' termination was attributable to 2004 shift of production to Mexico, and that Workers' jobs were being filled by workers in, among other places, Brazil).

Further, at the core of this argument by the Government is the Government's oft-repeated assertion that "Labor is bound to make its decisions based upon the record before it." *See* Def.'s Response at 13-14 (also arguing that the agency "was . . . substantially justified in relying only upon the existing evidence in the record to make its determination," and that "Labor was reasonable in relying only upon the record evidence in making its determination"). To be sure, the Labor Department must render its TAA/ATAA determinations based on the administrative record. But, as discussed in detail above, it is also clear that the Labor Department has a fundamental legal obligation to *develop* that record, by "marshal[ing] all relevant facts" in an agency investigation conducted with "the utmost regard" for the interests of the petitioning workers. *See*, *e.g.*, 29 C.F.R. § 90.12; Local 167, Int'l Molders and Allied Workers' Union, AFL-CIO v. Marshall, 643 F.2d at 31 (emphasis added) (noting agency's duty to conduct TAA investigations "with the utmost regard

for the interest of the petitioning workers"). Particularly given the repeated and relatively egregious nature of the shortcomings in the agency's investigation in this case, the Labor Department cannot justify its failure to reach a correct determination by pleading the limitations of an administrative record that the agency itself failed to properly develop. *See*, *e.g.*, Hess Mech. Corp., 112 F.3d at 150 (emphasizing that, while "[t]he EAJA does not tell an agency how to handle a case," the agency also "cannot decline to conduct further inquiry and then plead [its] own failure to investigate as reason to conclude that [its] position was substantially justified").

### h.  The Agency's Reliance on Euphemisms as Rationale

Finally, although the Government's Response mentions the matter in passing, nothing in the Government's Response addresses the concerns expressed in Invista I about the "false dichotomy" reflected in the Labor Department's first Remand Determination in this case (and in other TAA/ATAA cases as well), by which the agency seems to assume that layoffs due to "business decisions" aimed at "increasing efficiency" and "enhancing competitiveness" are never attributable to foreign competition (*i.e.*, increased imports or shifts of production abroad). *See* Def.'s Response at 13 (*quoting* Invista I,  33 CIT \_\_\_\_, 626 F. Supp. 2d at 1310-11); *see also* 73 Fed. Reg. at 32,739 (stating, *inter alia*, that "[i]nformation provided by [Invista] during the remand investigation revealed that the workers' separations are not related to the [2004] shift of production," but were instead the result of "a business decision to improve the efficiency of [Invista's] customer service organization").

Invista I explained, however, that the fact that workers are terminated as the result of "a business decision to improve the efficiency" of a company by no means logically precludes a finding

that the workers' terminations were due to foreign competition (whether increased imports, or – as here – a shift of production to a foreign country). *See generally* Invista I, 33 CIT at \_\_\_\_, 626 F. Supp. 2d at 1310-11. Invista I therefore admonished the Labor Department that the agency "cannot premise its determinations in TAA/ATAA cases on conclusory assertions about companies' 'business decisions' or on euphemisms such as 'enhanced competitiveness' and 'increased efficiency.'" *Id.*, 33 CIT at \_\_\_\_, 626 F. Supp. 2d at 1310-11. Instead, the agency must probe the reasons behind an employer's perceived need to enhance competitiveness and increase efficiency, to ascertain whether the company's drive for competitiveness and efficiency (and the termination of the workers at issue) are in fact based on the pressures of foreign competition. *Id.*, 33 CIT at \_\_\_\_, 626 F. Supp. 2d at 1311.

The Labor Department's unquestioning acceptance of the "false dichotomy" reflected in the first Remand Determination in this case is a phenomenon that has been the subject of criticism in other cases in the past. *See*, *e.g.*, BMC I, 30 CIT at 1338 n.32, 454 F. Supp. 2d at 1326-27 n.32; IBM II, 31 CIT at 520-22 n.72, 483 F. Supp. 2d at 1334-35 n.72. It constitutes yet another serious flaw in the agency's investigation here.

### i. Summary

The Labor Department's first three investigations in this matter – the agency's initial investigation, the agency's review of the Workers' Request for Reconsideration, and the agency's investigation in the course of the voluntary remand – would not provide "substantial justification" for the Government's position, even if the Labor Department owed no special obligation to petitioning workers. The unique nature of the agency's responsibilities in its administration of the

TAA/ATAA program, outlined in section II.A.1 above, merely strengthens the Workers' hand.

The straightforward recitation of the facts of this case alone suffices to refute any suggestion

that the Labor Department here properly discharged its duties to "marshal all relevant facts" and to

conduct its investigation with "the utmost regard" for the interests of the Workers, and – further –

definitively establishes that there was no "substantial justification" for the agency's position at the

administrative level.  *See* Gavette v. Office of Personnel Management, 808 F.2d 1456, 1467 (Fed.

Cir. 1986) (holding that "'substantial justification' requires that the Government show that it was

*clearly* reasonable in asserting its position, including its position at the agency level, in view of the

law and the facts") (footnote omitted).[43]

---

[43]The conclusion that the Government's position at the administrative level was not substantially justified is buttressed by the Labor Department's "track record" in other TAA cases filed with the Court of International Trade in recent years.  *See* Pierce v. Underwood, 487 U.S. at 569 (noting that "a string of losses can be indicative" on the issue of "substantial justification").  As BMC I observed, as a result of the inadequate record developed at the administrative level,"the Labor Department's *modus operandi* increasingly is to seek a voluntary remand in TAA cases that are appealed to the court"; thus, "[r]equests for voluntary remands have become all but routine." *See* BMC I, 30 CIT at 1352-53 & nn.59-60, 454 F. Supp. 2d at 1339-40 & nn.59-60; *see also id*., 30 CIT at 1367-68, 454 F. Supp. 2d at 1352-54 (summarizing statistics concerning TAA actions filed with Court of International Trade in recent years, and noting that – during four year period analyzed there – agency never successfully defended a denial of a TAA petition without at least one remand).

More recently, a review of all Labor Department TAA and ATAA cases in which opinions were issued between January 2008 and the present indicates that a voluntary remand was sought in all but two of those cases, reflecting the Government's judgment that the existing administrative records were not sufficient to support the Labor Department's determinations.  Moreover, in one of the two cases where the Government did not seek a voluntary remand, there were multiple court-ordered remands.  Indeed, a number of the cases required *multiple* remands.

Strong language criticizing the Government's position in an opinion on the "merits" of a case has also been held to be evidence in support of an award of fees and expenses.  *See* Marcus v. Shalala, 17 F.3d at 1038.  On this score, the language of Invista I and Invista II speaks for itself.  *See generally* Invista I, 33 CIT ____, 626 F. Supp. 2d 1301, *passim*; Invista II, 33 CIT ____, 657 F.

### 3.  The Government's Position in Litigation

The Government maintains that its position in litigation was substantially justified, citing "the same reasons" that it contends the Labor Department's position was substantially justified. *See* Def.'s Response at 15; *see generally id.* at 6-7, 8-10, 15-16.  The Government contends that it properly "relied upon the evidence in the administrative record in defending Labor's determination, and upon precedent from this Court and the Federal Circuit in determining its litigation positions." *Id.* at 15; *see also id.* at 6-7 (arguing that "the Government's position in litigation . . . was substantially justified because [it] was reasonably based upon evidence in the administrative record as it existed at the time, as well as controlling precedent of the United States Court of Appeals for the Federal Circuit").  As set forth below, the Government argues four specific points in an effort to establish that its positions in the course of this litigation were substantially justified.

The Government first asserts that its litigation position was substantially justified because the Government "relied upon precedent [holding] that although Labor has a duty to investigate, 'the nature and extent of the investigation are matters resting properly within the sound discretion of the administrative officials.'" *See* Def.'s Response at 15-16 (*quoting* Former Employees of CSX Oil & Gas Corp. v. United States, 13 CIT 645, 651, 720 F. Supp. 1002, 1008 (1989); additional citation omitted).  But surely the Government does not contend that the Labor Department's "sound discretion" is unbounded, and that the agency's investigations are immune from judicial review.  As set forth in section II.A.1 above, it is axiomatic that – although the Labor Department is vested with considerable discretion in the conduct of its investigation of TAA/ATAA claims – "there exists a

Supp. 2d 1359, *passim.*

threshold requirement of reasonable inquiry." Hawkins Oil & Gas, 17 CIT at 130, 814 F. Supp. at 1115; *see also* section II.A.1, *supra* (and authorities cited there). The analysis above has detailed numerous ways in which the Labor Department's investigations in this matter failed to satisfy that "threshold requirement of reasonable inquiry."

In addition, the Government recycles its claim that each of "Labor's determination[s], *based upon the record at the time*, was supported by substantial evidence." *See* Def.'s Response at 16.[44] This argument is also addressed and refuted above. *See* section II.A.2.c, *supra*. As detailed more fully there, the Government's argument fails to account for the Labor Department's affirmative obligation in TAA/ATAA cases to proactively develop the administrative record, by "conduct[ing] [its] investigation with the utmost regard for the interest of the petitioning workers" and "marshal[ling] *all* relevant facts" before reaching its determination. *See* Local 167, Int'l Molders and Allied Workers' Union, AFL-CIO v. Marshall, 643 F.2d at 31; 29 C.F.R. § 90.12 (emphasis

---

[44]The Government's Response actually states that the Government "relied upon the evidence in the administrative record in defending Labor's *determination*" (singular). *See* Def.'s Response at 15 (emphasis added). And, as note 27 above points out, the Government's defense of the United States' position at the administrative level focuses essentially exclusively on the Labor Department's first Remand Determination. *See* n.27, *supra*. The Government's reference to "Labor's determination" (singular) here thus may refer only to the Labor Department's first Remand Determination. *See* Def.'s Response at 15.

In any event, there were a total of three agency proceedings which preceded the final investigation (where the Labor Department determined that the 2004 TAA/ATAA certification should be amended to cover these Workers) – *i.e.*, the agency's initial investigation of the Workers' TAA/ATAA Petition, the agency's consideration of the Workers' Request for Reconsideration, and the agency's investigation in the course of the first (voluntary) remand. Under these circumstances, even if the Labor Department's first Remand Determination were found to be substantially justified, it would be difficult – if not impossible – to find that the United States' position at the administrative level was substantially justified based on a review of that first Remand Determination alone. And the Government's silence as to the agency's first two determinations is deafening.

added); *see also* <u>Hess Mech. Corp. v. NLRB</u>, 112 F.3d at 150 (holding that agency cannot decline to conduct further inquiry and then plead its own failure to investigate as reason to conclude that its position was substantially justified); section II.A.1, *supra* (discussing policy bases for Labor Department's special obligations in TAA/ATAA cases).

Moreover, even assuming that the Labor Department owed petitioning workers no special obligations in TAA/ATAA cases, there still would be no merit to the Government's assertion that – in the case at bar – each of "Labor's determination[s], *based upon the record at the time*, was supported by substantial evidence." *See* Def.'s Response at 16. As explained in section II.A.2.c above, even if the Labor Department's various determinations are reviewed solely on the basis of the administrative record before the agency at the time each determination was rendered, without regard to the agency's obligation to fully develop the record, those determinations still could not pass muster. *See* section II.A.2.c, *supra*.

The Labor Department's first two determinations in this matter – the agency's initial denial of the Workers' TAA/ATAA petition and the agency's denial of the Workers' Request for Reconsideration – were based on a provision of the regulations which has no application to this case, and thus were wrong as a matter of law. The adequacy or inadequacy of the administrative record was therefore immaterial. *See generally* section II.A.2.c, *supra*.

In addition, the Labor Department consistently failed to identify and seek to reconcile inconsistencies and discrepancies in the administrative record, and – in reaching its first Remand Determination – failed to properly consider and address the record evidence that "fairly detract[ed]" from the agency's conclusion. *See, e.g.*, <u>Consol. Bearings Co.</u>, 412 F.3d at 1269; <u>Gerald Metals</u>, 132 F.3d at 720. Most importantly, as discussed in detail above, there is simply no truth to the

Government's claim that – at the time the Labor Department issued its first Remand Determination – there was "no record evidence" to undermine the agency's conclusion that the Workers' termination was not attributable to Invista's 2004 shift of production to Mexico. *See*, *e.g.*, section II.A.2.c, *supra*. As outlined above, the agency's determination was in stark conflict with ample record evidence, starting with the statement of Invista's Chattanooga Plant Manager, who attested under oath that the termination of the Workers was "a continuation of the [2004] shift in production to Mexico." *See* A.R. 2; *see also* nn.28-29, *supra* (summarizing record evidence indicating that Workers' termination was attributable to 2004 shift of production, as well as record evidence that Workers' customer service duties were assumed by personnel in Brazil).

For all these reasons and more, there can be no claim that Labor's determinations were supported by substantial evidence "based upon the record at the time" that each was rendered. *See* Def.'s Response at 16 (original emphasis omitted). Like the Government's first argument, this argument too provides no support for the Government's claim that its litigation position was substantially justified.

Citing Barry Callebaut and Marathon Ashland Pipe Line, the Government further argues that its pursuit of this litigation was substantially justified because "it was appropriate to defend Labor's reliance upon evidence provided by company employees." *See* Def.'s Response at 16 (discussing Barry Callebaut, 357 F.3d at 1383; Marathon Ashland Pipe Line, 370 F.3d at 1385). As explained more fully above, however, neither Invista I nor Invista II concluded that the agency had erred simply by relying on information provided by the Workers' former employer. *See* section II.A.2.d, *supra*. Instead, the Labor Department was faulted for – in effect – improperly delegating to an Invista lawyer the power to decide the Workers' TAA/ATAA claim, by framing its inquiries in terms

of the "ultimate fact" to be determined by the agency – specifically, whether the Workers' termination was attributable to the 2004 shift of production to Mexico. *See id.*

In any event, as discussed above, Barry Callebaut and Marathon Ashland Pipe Line are inapposite here. Those cases hold that the Labor Department is entitled to rely upon information provided by employers in TAA/ATAA cases – but only where (1) "the Secretary reasonably concludes that [the employer's] statements are creditworthy," and (2) the employer's statements "are not contradicted by other evidence." *See generally* section II.A.2.e, *supra* (discussing Barry Callebaut, 357 F.3d at 1383; Marathon Ashland Pipe Line, 370 F.3d at 1385). And, as explained above, neither of those conditions was met in this case. *See id.*

Finally, the Government asserts that its litigation position was substantially justified because the Government "relied upon the statutory standard that a review of a negative TAA determination is based solely upon the facts in the administrative record before the Court and nothing else." *See* Def.'s Response at 16 (citations omitted). This argument refers back to the Government's claim that Invista I looked beyond the administrative record – an argument which is addressed, and disposed of, above. *See* section II.A.2.g, *supra*. As explained at some length there, the Government's argument is predicated on an obvious misreading of Invista I.

Contrary to the Government's implication, Invista I plainly did not conclude that the termination of these Workers was attributable to foreign competition. *See* section II.A.2.g, *supra*. In the excerpt which the Government highlights, Invista I noted only that foreign competition led to Invista's 2004 shift of production to Mexico (which, in turn, led to the 2004 TAA/ATAA certification). *See id.* And the basis for the 2004 TAA/ATAA certification was never in dispute in this case. Indeed, it is fully documented in the administrative record in this action. *See id.*; *see also*

A.R. 5-6 (Labor Department's 2004 TAA/ATAA certification of Invista workers); 69 Fed. Reg. 54,320 (same). There is thus no merit to the Government's argument that Invista I was not "based solely upon the facts in the administrative record before the Court and nothing else." *See* Def.'s Response at 16 (citations omitted). As such, the Government cannot rely on that claim to establish that its litigation position here was substantially justified.

In light of the above, and given that the Government expressly argues that its litigation position in this matter was substantially justified "for the same reasons" that it asserts the Labor Department's position was substantially justified (*see* Def.'s Response at 15), the conclusion that the Government's litigation position was not substantially justified seems almost inexorable. Under the circumstances, however, there is no need to reach that issue.

On the facts of this case, even assuming that the Government's litigation position was substantially justified, the overall position of the United States was not. *See generally* Chiu v. United States, 948 F.2d at 715 (noting, with approval, that – in making EAJA award – trial court "assumed the government's position in litigation . . . to be reasonable, but found that the lack of substantial justification [for the agency's action at the administrative level] outweighed any reasonable positions taken thereafter"). "As exemplified in the EAJA and [Rule 11 of the Federal Rules of Civil Procedure], . . . the processes of litigation presuppose some reasonable investigation . . . " Hess Mech. Corp., 112 F.3d at 150; *cf*. *id*. at 147 (criticizing "flimsiness" of administrative record of investigation). In the case at bar, "any justification for the litigation phase cannot outweigh the lack of substantial justification for the original agency action." Chiu v. United States, 948 F.2d at 715 (internal quotation marks and quotation omitted).

Accordingly, there is no need to further parse the merits of the Government's conduct of this

litigation before concluding that, for purposes of an EAJA award, the United States' position was not substantially justified. *See*, *e.g.*, Kelly v. Nicholson, 463 F.3d at 1355 (concluding that government's position was not substantially justified based solely on lack of justification for agency's actions at administrative level); Role Models America, Inc. v. Brownlee, 353 F.3d 962, 967-68 (D.C. Cir. 2004) (noting that, even assuming that government's litigation position was "substantially justified," plaintiff was eligible for EAJA award based on lack of substantial justification for agency's actions); BMC II, 31 CIT at 1626-27, 519 F. Supp. 2d at 1313-15 (same); *cf*. Former Employees of Tyco Electronics v. U.S. Dep't of Labor, 28 CIT 1571, 1576 n.2, 350 F. Supp. 2d 1075, 1089 n.2 (2004) (finding a lack of substantial justification in TAA case without considering Labor Department's position at the administrative level, where "the Government's position during . . . litigation was not substantially justified").

Because the United States' position in this matter was not substantially justified, the Workers are entitled to an award of attorneys' fees and expenses under the EAJA. What remains to be determined is the amount of that award.

### B. **The Calculation of the Workers' EAJA Award**

To determine the size of a reasonable award of attorneys' fees under the EAJA, a "lodestar" figure is calculated by multiplying "the number of hours reasonably expended" by "a reasonable hourly rate." *See* Hensley v. Eckerhart, 461 U.S. at 433. In support of their EAJA Application, the Workers have submitted an affidavit from their counsel, as well as a computer-generated statement captioned "Matter Worked Detail Report" accounting for the time and expenses that counsel incurred in this action. *See* Declaration of Thomas A. Telesca in Support of Application for Fees

and Other Expenses Under EAJA ("Telesca Declaration"); Pls.' EAJA Application, Exh. B. The Telesca Declaration attests, *inter alia*, that the rates reflected in the computer-generated statement are the standard hourly rates charged by the Workers' counsel. *See* Telesca Declaration ¶ 8. The computer-generated statement lists entries in chronological order, and – for each entry – includes the date the work was done, the number of hours billed (in six-minute increments), the total fee for the time billed in the entry (at counsel's standard hourly rate at the time), and a summary description of the tasks performed. *See* Pls.' EAJA Application, Exh. B. The statement also specifies the total fees calculated at counsel's standard hourly rates. *Id.*

The second component of the "lodestar" figure – after "the number of hours reasonably expended on the litigation" – is "a reasonable hourly rate of compensation." *See* Hensley v. Eckerhart, 461 U.S. at 433. The EAJA caps attorneys' fees at $125 per hour, "unless the court determines that an increase in the cost of living or a special factor . . . justifies a higher fee." 28 U.S.C. § 2412(d)(2)(A)(ii). The computer-generated statement submitted by the Workers indicates that the standard hourly billing rates of their counsel exceeded the $125 per hour statutory cap. *See* Pls.' EAJA Application, Exh. B; *see also* Telesca Declaration ¶ 8. Thus, all attorney hours reasonably expended on the Workers' behalf are compensable at the rate of at least $125 per hour (and more, if justified by "an increase in the cost of living or a special factor").[45]

A review of the computer-generated statement submitted by the Workers indicates both that counsel devoted a total of 104.8 hours to this matter, and that the tasks that he completed and the amount of time devoted to each of those tasks were reasonable. Accordingly, absent any objection

---

[45]The Workers are not seeking an award for "paralegal fees." *See* Pl.'s EAJA Application at 7 n.2.

by the Government to those figures, the Workers are entitled to an award reflecting a total of 104.8 hours reasonably expended by their counsel on their behalf. *See* Def.'s Response at 1 (explaining that Government does not challenge "the reasonableness of the amount of fees" that Workers seek).

As to the "reasonable hourly rate" to be used in calculating the award of attorneys' fees, the Workers do not argue that there are any "special factors" present which might justify a fee higher than the statutory cap. Nor do the circumstances of this case suggest the need for such a "special factors" enhancement. A cost of living adjustment to the EAJA $125 per hour statutory cap is appropriate, however. *See generally* BMC II, 31 CIT at 1683-87, 519 F. Supp. 2d at 1364-67 (and authorities cited there). Using the Consumer Price Index - All Urban Consumers ("CPI-U") data for March 1996 as the baseline for calculations,[46] and adjusting those data to reflect increases in the cost of living as of March of the respective year at issue, the applicable EAJA statutory cap is $164.88 per hour for attorney time expended in 2007, $171.38 per hour for attorney time expended in 2008, and $170.75 per hour for attorney time expended in 2009. The Workers are thus entitled to an award of attorneys' fees in the sum of $4,732.06 for the 28.7 hours expended by counsel in 2007, $9,048.86 for the 52.8 hours expended by counsel in 2008, and $3,978.48 for the 23.3 hours expended by counsel in 2009 – for a total award of attorneys' fees in the sum of $17,759.40.

In addition to attorneys' fees, the Workers also seek an award of $363.20 for expenses incurred by counsel in the course of this litigation. *See* Pls.' EAJA Application, Exh. B. In support of their request, the Workers have supplied the requisite "itemized statement," including "a breakdown of expenses such as the amounts spent copying documents, telephone bills, mail costs

---

[46]The EAJA statutory cap of $125 per hour became effective in March 1996. *See* Atlantic Fish Spotters Ass'n v. Daley, 205 F.3d 488, 490 n.1 (1st Cir. 2000).

and any other expenditures related to the case." *See id.*; Naporano Iron and Metal Co. v. United

States, 825 F.2d 403, 404 (Fed. Cir. 1987); 28 U.S.C. § 2412(d)(1)(B) (requiring submission of

"itemized statement").

The documentation provided by the Workers supports their request for $123.96 for

reproduction costs, $121.33 for computer-assisted legal research expenses, $57.74 for postage,

$39.00 for binding, and $21.17 in telephone charges – sums which appear to be entirely reasonable

under the circumstances. *See* Pls.' EAJA Application, Exh. B. Moreover, the Government does not

object to the sum that the Workers seek. *See* Def.'s Response at 1 (explaining that Government does

not challenge "the reasonableness of the amount" that Workers seek). Accordingly, the Workers'

request for an award of $363.20 for expenses shall be granted.

### III. Conclusion

The Court of Appeals has spoken eloquently to the importance of the EAJA in veterans'

benefits cases, beginning with the proposition that "'[t]he essential objective of the EAJA [is] to

ensure that persons will not be deterred from seeking review of, or defending against, unjustified

governmental action because of the expense involved in the vindication of their rights.'" Kelly v.

Nicholson, 463 F.3d at 1353 (quotation omitted). The Court of Appeals has emphasized that

"[r]emoving such deterrents is imperative in the veterans benefits context, which is intended to be

uniquely pro-claimant, . . . and in which veterans generally are not represented by counsel [at the

administrative level]." *Id.* (citations omitted). Thus, the Court of Appeals has concluded, "EAJA

is a vital complement to this system designed to aid veterans, because it helps to ensure that they

will seek an appeal when the VA has failed in its duty to aid them or has otherwise erroneously

denied them the benefits that they have earned." *Id*.

There are powerful parallels between the statutory scheme governing veterans' benefits and that governing trade adjustment assistance for workers whose jobs have been sacrificed to international trade, for the greater good of the nation. *See* section II.A.1, *supra*; BMC I, 30 CIT at1370-73, 454 F. Supp. 2d at 1355-58 (comparing TAA and veterans' benefits schemes). And, much as it does in the veterans' benefits context, the EAJA plays a critical role in fulfilling the purpose and the promise of the TAA/ATAA laws, as enacted by Congress. *See* Kelly v. Nicholson, 463 F.3d at 1353; BMC II, 31 CIT at 1688-89, 519 F. Supp. 2d at 1368-69.

In short, what the Court of Appeals has said of the EAJA in veterans' benefits cases applies with equal force in the context of TAA/ATAA: "EAJA is a vital complement to . . . [the TAA/ATAA program] designed to aid . . . [displaced workers], because it helps to ensure that they will seek an appeal when the [Labor Department] . . . has failed in its duty to aid them or has otherwise erroneously denied them the benefits that they have earned." *See* Kelly v. Nicholson, 463 F.3d at 1353.

The plaintiff Workers here have their *pro bono* counsel to thank for securing for them the TAA/ATAA benefits that the Labor Department thrice denied them. For all the reasons set forth above, the Workers are also entitled to an award of attorneys' fees and expenses under the EAJA, in the sum of $18,122.60.

So ordered.

/s/ Delissa A. Ridgway
_____
Delissa A. Ridgway
Judge

Decided: June 28, 2010
       New York, New York